Argued January 18, reversed and decree entered June 27, rehearing
denied October 10, 1922.

# In Re FALING WILL.

## STRONG et al. *v.* SMITH et al.

(208 Pac. 715.)

**Appeal and Error—Notice Need not be Served on Adverse Party Who Did not Appear.**

1. Under Section 550, Or. L., requiring notice of appeal not taken at the time of the decree to be served on such adverse parties as have appeared, it is not necessary to serve a notice of appeal on adverse parties who were served with citation in proceedings to contest a will, but who did not file an answer or give written notice of appearance, though they did appear as witnesses.

**Appeal and Error—Beneficiary Under Both Wills Held not Adverse Party to Contestants of Later Will.**

2. Where testatrix had executed two wills, the first of which was admittedly valid if it was not revoked by the second, a beneficiary under both wills who was made a party to proceedings to contest the later will and filed an appearance therein, and who would receive a larger share of the estate under the earlier will than under the later, and was represented on the appeal by counsel in opposition to the later will, was not a party adverse to the contestants of the later will on whom notice of the appeal must be served to give the court jurisdiction over the appeal.

**Wills—Proponents have Burden of Proving Testamentary Capacity.**

3. The proponents have the burden of proving by a preponderance of the testimony testamentary capacity of testatrix at the time of the execution of the will offered by them.

**Wills—Knowledge of Affairs and Objects of Bounty is Test of Mental Capacity.**

4. The rule in regard to testamentary capacity is that, if a testator at the time he executed his will understood the business in which he was engaged and had a knowledge of his property and the way he wished to dispose of it among those entitled to his bounty, he possessed sufficient testamentary capacity notwithstanding old age, debility, or extreme distress.

**Wills—Clear and Convincing Proof is Necessary to Show Insane Testatrix had Lucid Interval When Will was Executed.**

5. Where habitual insanity on the part of the testatrix is proved, the fact that the will was executed during a lucid interval can be established only by clear and convincing proof, with respect to which the burden is on proponents.

---

4. As to what constitutes capacity or incapacity to make a will, see notes in 27 L. R. A. (N. S.) 2, and L. R. A. 1915A, 444.

**Wills—Marked Change in Habits is Evidence of Mental Unsoundness.**

6. A marked change in a person's habits and thoughts is evidence of mental unsoundness.

**Wills—Testamentary Capacity Determined from Circumstances of Each Case.**

7. There is no particular degree of mental acumen to serve as a standard for testamentary capacity, but each case must be decided upon its own facts and circumstances.

**Evidence—Attesting Witnesses and Intimate Acquaintances can Give Opinion as to Sanity and Reasons Therefor.**

8. Under Section 727, Or. L., a subscribing witness to a will can testify as to his opinion respecting mental capacity of testatrix, and in addition witnesses who are intimate acquaintances of testatrix could properly express their opinion as to her sanity and give their reasons for it.

**Evidence—Opinions of Witnesses as to Capacity are not Conclusive.**

9. It is for the court to determine from the evidence whether testatrix possessed testamentary capacity, and the facts and circumstances as to her mental state have most weight in passing upon the question; the court may be aided, but not controlled, by the opinion of witnesses, especially expert witnesses.

**Wills—Preparation and Execution in Presence of Interested Persons Only Imposes Greater Burden on Proponents.**

10. Where the will was prepared by one of the chief beneficiaries and was executed by testatrix in the presence only of those who were beneficiaries, or who were related to beneficiaries, proponents must establish the testamentary act with greater particularity than would be required where the will is prepared by and executed in the presence of disinterested persons.

**Wills—Evidence Held to Show Testamentary Incapacity at Time of Execution of Last Will.**

11. In proceedings to contest a will, where it was conceded by all parties that testatrix was competent to execute a prior will four years before the will in controversy was executed, evidence that within the year preceding the execution of the last will she became unable to attend to any business and required the constant attention of nurses, who treated her as if she were a child, and that such condition increased and continued until her death, two years later, *held* to show that testatrix was incompetent mentally to execute the last will, notwithstanding testimony by her physician that she was competent.

---

8. Competency of subscribing witnesses and effect of their testimony opposing or supporting a will, see note in 77 **Am. St. Rep.** 459.

11. Comparative weight of testimony by physician and layman on question of testamentary capacity, see note in **Ann. Cas.** 1914D, **343.**

From Multnomah: GEORGE W. STAPLETON, Judge.

In Banc.

This is a contest to determine whether a will dated August 26, 1915, is the last will and testament of Xarifa J. Faling, or whether a will dated August 25, 1911, together with six codicils thereto, is the last will and testament of Xarifa J. Faling. The proceeding was instituted by W. Tyler Smith on August 23, 1917, as the sole next of kin of Xarifa J. Faling, deceased. During the proceedings the proponents offered evidence as to the due execution of the will made by Mrs. Xarifa J. Faling on August 25, 1911, together with six codicils thereto. After the introduction of this proof, on July 2, 1918, an amended petition was filed alleging in substance that the will of August 25, 1911, together with the codicils thereto was the last will and testament of Xarifa J. Faling deceased, and also alleging that two bequests therein, one to Charles Jensen and wife and the other to Theodore Jensen and wife each in the sum of $2,000 had been assigned to petitioner who claimed a right by reason of the assignment. Thereafter a petition was filed by Frances Gray and others, beneficiaries under the will of 1911, and codicils, and issues were duly joined thereon. It was stipulated that all the testimony theretofore taken should be considered under the amended petition and the separate contest.

Mrs. Xarifa J. Faling died on July 5, 1917, and the will of August 26, 1915, was probated in common form on July 9, 1917. After a large amount of testimony was taken the judge of the County Court of Multnomah County on May 24, 1919, entered an order sustaining the will of August 26, 1915, and dismissed the contestants' petitions. Thereafter an appeal was

taken to the Circuit Court of Multnomah County, where a decree was rendered on June 4, 1920, affirming the decree of the county court sustaining the will of August 26, 1915, from which decree the contestants appeal to this court.

The will of August 26, 1915, reads as follows:

"In the Name of God—Amen.

"Know all men, that I, Xarifa J. Faling, of Portland, in the State of Oregon, of the age of 68 years, being of sound and disposing mind and memory at this time and not acting under duress, menace, fraud or undue influence of any person whomsoever, do make, publish and declare this my Last Will and Testament in manner and form following, to wit:

"First. It is my will, and I do order, that all my just debts and funeral expenses be duly paid and satisfied as soon as conveniently can be done after my decease.

"Second. I give and bequeath unto each, the sum of Three Thousand Dollars, to the Beaverton Childrens Home, St. Agnes Baby Home, Childrens Home at Corbett and Gains Street, Visiting Nurses Association, Mann Old Peoples Home 32d and Sandy Road, William E. Metzger, Carl Schieck, Catherine Becker, Etna B. Chattin.

"Third. In lieu of the present Court arrangements, I bequeath my so called Brother, if he be living at my death, the sum of Ten Thousand Dollars, otherwise this bequest to remain a part of my estate.

"Fourth. To all others claiming relationship, or makeing demands, or contestants of this my Last Will, I bequeath the sum of one Dollar.

"Fifth. After the above bequests have been paid, I give and bequeath the balance of my entire estate, both Real and Personal, equal to both C. L. Mead and Thos. N. Strong, long time friends.

"And, Lastly, I nominate, constitute and appoint Thos. N. Strong and C. L. Mead, without the requirement of Bonds, for the fulfillment of my directions

herein stated, to be the executors of this my Last Will, hereby revoking all other Wills, Legacies and Bequests by me heretofore made, and declaring this, and no other, to be my Last Will and Testament.

"IN WITNESS WHEREOF, I have hereunto set my hand, this Twenty-sixth day of August, in the year of our Lord One Thousand Nine Hundred and Fifteen, 1915.

"(Signed)    XARIFA J. FALING.    (Seal)

"The above instrument was at the date thereof signed, sealed, published and declared, by the said Xarifa J. Faling, as and for her Last Will and Testament, in the presence of us, who, at her request and in our presence, and in the presence of each other, have subscribed our names as witnesses thereto.

"LYDIA A. METZGER,
"Residing at Portland, Ore.
"CHAS. E. MORELAND,
"Residing at Portland, Ore."

The testimony shows that on or about August 25, 1911, at Portland, Oregon, Xarifa J. Faling made, executed, published and declared a certain instrument in writing to be her last will and testament, which instrument was executed by her in the presence of E. W. Creighton and Katherine O'Neil, each being competent witnesses thereto over the age of twenty-one years, who, at the request of said testatrix, subscribed their names respectively to the will in the presence of the testatrix and in the presence of each other; and that by this last will and testament the following bequests were made:

1. Debts paid.
2. Patton Home, $2,000.
3. Oregon Humane Society, $3,000.
4. Charles Jensen and wife, $2,000.
5. Theodore Jensen and wife, $2,000.
6. Lena Doran, $1,000.
7. Frances Gray, $1,000.

8. Sarah Gray Warnecke, $1,000.
    In case of her death this goes to her daughter, Harriet Gray Warnecke.
9. Alice Meredith Gray, $1,000.
10. Thomas Gray, $1,000.
11. Cornelius Barrett, $30 per month.
12. Salvation Army, $1,000.
13. Portland Library, $1,000.
14. Good Samaritan Hospital, $2,000.
15. The Home, West Half of Lots 7 and 8, Block 63.
16. August Warnecke, all of the rest of lands and real estate.
17. To Ben Selling in trust for Jewish Hospital, $5,000.
18. William E. Metzger, $6,500.
19. All of balance of property to the Home.
20. In case any legatee named die the legacy reverts to general estate.
21. Thomas N. Strong, executor.

Thereafter on the dates hereinafter mentioned, as shown by the testimony, Xarifa J. Faling, made, executed, published and declared six codicils to the will of August 25, 1911, each in the presence of two competent witnesses and in due form, which are in substance as follows:

Codicil No. 1, October 16, 1911.
    In the case of death of Thomas N. Strong, Addison A. Lindsley and William E. Metzger to be executors.
Codicil No. 2, January 25, 1912.
    William N. Gatens, William E. Metzger and Addison A. Lindsley appointed executors.
    Ada E. Mortag given $1,000 and Jessie Mortag $1,000.
Codicil No. 3, August 2, 1912.
    William E. Metzger, $10,000 instead of $6,500.
Codicil No. 4, October 4, 1912.
    William E. Metzger and Lot Q. Swetland appointed executors.
Codicil No. 5, September 30, 1913.

William N. Gatens and Lot Q. Swetland appointed
executors.

Codicil No. 6, June 6, 1914.

As a codicil to my foregoing last will and testa-
ment, 1st, I hereby revoke the appointment of
executors heretofore made in said will and the
codicils thereto and appoint in this codicil A. L.
Mills of the city of Portland, Oregon, as the sole
executor of my last will and testament and re-
quest and direct that he be not required to give
bonds.

2nd. I hereby bequeath and give Lot Q. Swet-
land the sum of Five Thousand Dollars ($5,000).

3rd. I hereby revoke the former bequests by me
made to William E. Metzger and in place thereof
I give and bequeath to William E. Metzger the
sum of $5,000. In every other respect ratifying
and confirming my said former Will and all the
Codicils thereto except as herein stated.

When the will of August 25, 1911, and the codicils
thereto were executed, published and declared as the
last will and testament or codicils thereto of Xarifa
J. Faling she was of sound and disposing mind and
memory, was competent and was not acting under
duress, menace, coercion, fraud, or undue influence
of any person whomsoever. The will and codicil were
never revoked by Xarifa J. Faling unless there was a
revocation contained within the will of August 26,
1915. A short time after August 26, 1915, the will of
August 25, 1911, and the codicils thereto were de-
stroyed. The substance thereof was reproduced from
the stenographer's notes of an abstract of the will
and codicils prepared by Mr. Thomas N. Strong who
carefully drew and superintended the execution of
the will of 1911, and all or nearly all of the codicils
thereto.

As shown by the registry of births Xarifa J. Faling
was born on August 16, 1839, in Abergavenny, Mon-

mouth County, England. She was abandoned by her father in Peru in the late 1840's. She was given by her mother to a family named Robinson, who took her with them to the eastern states, where she remained until she was about twenty-four years old. In a deposition in one of the cases (*Barrett* v. *Barrett*, 5 Or. 411; *Barrett* v. *Failing*, 8 Or. 152), Mrs. Faling stated that she did not know her age. After the abandonment of the family the father, Charles Barrett, came to San Francisco in the 1850's. He was followed by Mrs. Barrett. Differences arose between them and they were divorced in 1870, Mrs. Barrett remaining for a time in California and Mr. Barrett settling in Portland, Oregon. At that time the family consisted of the father, Charles Barrett; the mother, Mary E. Barrett; three sons, Charles, Cornelius and Arthur; and one daughter, Xarifa Jane, who are all now deceased. Charles accompanied his father to Portland where the elder Barrett with his son Charles opened a bookstore, which for some time was the chief book and stationery store of the city and was located at Front and Washington Streets. Both men were of intemperate habits. Xarifa Jane Barrett arrived in Portland in 1863, and assumed the burden of conducting the household and the store. In the divorce proceedings it appears that the family divided into two contesting groups, the father, Charles Barrett, and his son Charles and daughter Xarifa Jane being opposed to the mother and the two sons Arthur and Cornelius. In his answer filed in the divorce proceedings the father, Charles Barrett, denied the paternity of Arthur and Cornelius. Charles Barrett, the father, purchased the lot on the southeast corner of the intersection of Fifth and Washington Streets in the City of Portland. This property was

conveyed to the daughter, Xarifa Jane Barrett, in 1868. In December, 1870, Mrs. Barrett instituted a suit in Multnomah County for the collection of an alimony judgment obtained in San Francisco. This suit was contested and appealed to this court: *Barrett* v. *Barrett,* 5 Or. 411. The record there shows that William Strong, father of Thomas N. Strong, appeared as attorney for the defendants, Charles Barrett and Xarifa Jane Faling, then Xarifa Jane Barrett. Thereafter there was considerable litigation between Mrs. Faling and one of the opposing family faction. Charles Barrett, the father, died November 1, 1873. In 1878, William Strong and Sons, Thomas N. Strong and Fred R. Strong, appeared for Mrs. Faling in a suit against her by her mother involving the bookstore: *Barrett* v. *Failing,* 8 Or. 152. In 1880, there was a suit by Mary E. Barrett against Xarifa Jane Faling in the District Court of the United States for the District of Oregon where William Strong appeared as attorney for Mrs. Faling. This case was appealed to the Supreme Court of the United States where Mrs. Faling was represented by Hon. J. N. Dolph, then United States Senator from Oregon: See *Barrett* v. *Failing,* 111 U. S. 523 (28 L. Ed. 505, 4 Sup. Ct. Rep. 598). Thomas N. Strong represented Mrs. Faling either individually or in conjunction with other attorneys in several proceedings brought by Mrs. Barrett and Cornelius jointly and by Cornelius individually against Mrs. Faling in the County and Circuit Courts of the State of Oregon.

Some time in the early 70's Xarifa Jane Barrett married Charles D. Faling. He was a man of some ability with an engaging personality, but with a belief in morals founded upon the double standard. In

1887, his relations with two different women became so flagrant that he was discovered in an attempt to flee from the state with one of the women to Buenos Aires, absconding with about $25,000 of the property of Mrs. Faling. The outraged wife repaired to San Francisco and discovering him in company with one of the women killed him. Thomas N. Strong appeared in San Francisco and assisted in the murder trial, the case of *People* v. *Xarifa J. Faling*. Upon the first trial the jury disagreed. Upon the second Mrs. Faling was acquitted upon the plea of temporary insanity. Mrs. Faling when arrested in San Francisco for the killing of Charles D. Faling was incarcerated in what was then known as the old city hall on the corner of Washington and Kearney Streets. At that time one Patrick Crowley was chief of police of San Francisco. This prison was situated on the edge of Chinatown in a dilapidated building surrounded by old structures of pioneer days. It was rat infested.

After Mrs. Faling returned to Portland from a trip to Europe she was engaged in a series of litigation with Cress Brothers and others. At that time Cornelius Barrett through various attorneys instituted proceedings in the County Court to compel Mrs. Faling to support him as a brother. In these cases Thomas N. Strong appeared as attorney for Mrs. Faling. The latter litigation resulted in a judgment awarding to Cornelius Barrett the sum of $30 a month. After returning to Portland in the early 90's Mrs. Faling and her daughter Lilly lived at various boarding-houses and hotels. For several years prior to the fall of 1914, Mrs. Faling lived at the Sargent Hotel which was formerly the Brown. In January, 1900, Lilly Faling was married to Carl

Schieck. The issue of their marriage was a boy born in 1901. In May, 1903, Lilly Faling Schieck died. During their married life Mrs. Faling assisted them to the extent of nearly $3,000. After the death of her daughter Mrs. Faling had her grandson with her in Portland until he died in 1905. Mrs. Faling and Carl Schieck carried on a correspondence until 1906, when Mrs. Faling wrote him a kindly letter which he never answered. Schieck remarried about this time and never called afterwards to see Mrs. Faling, although he was in the City of Portland many times. He states that he entered a different world as to family affairs.

During Mrs. Faling's stay in Portland by thrifty management of the bookstore, the operation of a rooming-house on the present site of the Swetland building and great care of her property she accumulated a fortune of approximately $600,000. Mrs. Faling while at the Sargent Hotel became acquainted with Mrs. Clara H. Waldo, widow of the late Judge John B. Waldo who had lived at the Sargent Hotel prior to his death. Mrs. Faling and Mrs. Waldo were good friends. Mrs. Faling discussed her property and her future intentions with Mrs. Waldo. In 1910, Mrs. Waldo was regent of Oregon Agricultural College at Corvallis, was interested in a young man living on her farm near Salem named Kaiser and arranged to pay the expenses of this boy through College. She informed Mrs. Faling of this. At that time there was employed in the Sargent Hotel, as an elevator boy, a young man named William E. Metzger. Mrs. Faling ascertained that this young man had been compelled to give up his schooling to assist his mother. She made him small presents of money. He left the hotel for employment elsewhere. On one of his visits

at the Sargent Hotel Mrs. Faling broached the matter of having him complete his education at some college at her expense, to which he acquiesced after consultation with his people. In September of that year Mrs. Waldo and Mrs. Faling went to Corvallis with the two boys and installed them in the college. From that time until into 1912, a correspondence was carried on between Mrs. Faling and William E. Metzger. She paid all of his expenses and apparently was desirous of adopting him. Before young Metzger had completed his four year course at Oregon Agricultural College, on St. Valentine's Day, 1913, without the advice of, or consultation with, Mrs. Faling he married a young lady who was then attending the same college. This was a great disappointment to Mrs. Faling who was very anxious for Metzger to complete his college course.

Mrs. Faling made a number of wills which were drawn by Thomas N. Strong. In none of her wills prior to August 26, 1915, was either C. Lewis Mead or Thomas N. Strong made a beneficiary.

REVERSED AND DECREE ENTERED.    REHEARING DENIED.

For appellants there was a brief over the names of *Mr. Coy Burnett, Mr. Guy C. H. Corliss, Mr. E. E. Heckbert* and *Mr. R. E. Sewell,* with oral arguments by *Mr. Burnett* and *Mr. Corliss.*

For respondents there was a brief over the names of *Mr. John F. Logan, Mr. C. Henri Labbe* and *Mr. James G. Wilson,* with an oral argument by *Mr. Logan.*

BEAN, J.—1. As a preliminary question it is submitted in the brief of proponents and respondents that this court has no jurisdiction of this proceeding

for the reason that all parties adverse to the appellants appearing in the lower court have not been served with a notice of appeal, such parties being the old People's Home of Portland, the Visiting Nurses Association, Etna B. Chattin and William E. Metzger, who were each served with a citation, and The Home, which was served with a citation and also filed an answer suggesting that the validity of the will of 1915 be first determined before the hearing of the petition for the probate of the 1911 will. The above-named parties, except The Home, did not answer or appear in the trial of these proceedings, except that Etna B. Chattin and William E. Metzger were witnesses for proponents. Section 550, Or. L., requires that:

"If the appeal is not taken at the time the decision, order, judgment or decree is rendered or given, then the party desiring to appeal may cause a notice, signed by himself or attorney, to be served on such adverse party or parties as have appeared in the action or suit, or upon his or their attorney * * ."

The citation served upon the parties answers the purpose of a summons, and unless such parties file an answer or give written notice of appearance they are not entitled to service of notice of further proceedings in the action, or to notice of appeal: See Section 542, Or. L.: *Belknap* v. *Charlton*, 25 Or. 41 (34 Pac. 758).

2. As stated, The Home appeared in the contest by filing an answer. It is not an adverse party in this proceeding and would not be aggrieved by a decision of this court setting aside the probate of the will of 1915, and establishing the validity of the will of 1911. It is shown by the record that under the will of 1911, The Home is given a vastly larger share of the estate than under the will of 1915. The record further dis-

closes that The Home filed a petition in this court duly verified showing that this charitable institution "has the most vital interest in the contest of the probate of said will," and praying that it might appear in this court upon appeal by its attorney Hon. Guy C. H. Corliss, and file a brief herein and make oral argument on behalf of The Home. Judge CORLISS appeared in this court with counsel for contestants at the time of hearing argument. The Home therefore is far from being an adverse party on this appeal: See *Appeal of Buckingham,* 57 Conn. 544 (18 Atl. 256); *Smith* v. *Chaney,* 93 Me. 214 (44 Atl. 897); *McDonald* v. *McDonald,* 142 Ind. 55 (41 N. E. 336); *In re Hunt's Will,* 122 Wis. 460 (100 N. W. 874). No notice to dismiss the appeal was filed by respondents. The record shows that this court has jurisdiction of this proceeding upon this appeal.

### ON THE MERITS.

After the amended petition for the probate of the will of Xarifa J. Faling dated August 25, 1911, was filed in the County Court, the claim of W. Tyler Smith as an heir of Mrs. Faling became extinct. The question now is whether the will of August 25, 1911, and the codicils thereto, or the will of August 26, 1915, is the last will and testament of Xarifa J. Faling, deceased.

It is conceded by both sides in this proceeding that at the time of the execution of the will of August 25, 1911, and the codicils thereto Mrs. Faling was competent to make a will. Her mental condition prior to June 6, 1914, the date of the last codicil to the 1911 will, is material only to the extent that it bears upon her mental capacity on August 26, 1915, the date of the execution of the last document purporting to be her last will and testament.

Mrs. Faling, for several years, was affected with paralysis agitans, commonly called palsy. The first indication of her mental trouble of particular consequence occurred in April or the first of May, 1911, when she had what is termed a "nervous breakdown." Dr. R. Stearns treated her during April, May and until the end of June or into July of that year. He had been acquainted with her at the Sargent Hotel since about 1906. Dr. Stearns was a witness for contestants. He testified as follows: (We set out only excerpts of the testimony.)

"A. In 1911 I treated her, for, she had a cold and a sort of influenza then, that was along in April, I treated her in April up to the latter part of June, possibly into July; during the first part of her sickness, in that period of 1911, she was quiet nervous, she was troubled with a sort of delusion and more or less nervous, she didn't improve from these symptoms as much as I thought she should, as fast as she should at that time, and she also had a condition at that time which we considered paralysis agitans, or Parkinson's Disease, she had this previous to this, and then there was some little period afterwards, along in April, the latter part of April, she had a little mental confusion, and during the month of May this grew worse.

"Q. Was her mental confusion manifested in part at least by delusions?

"A. It was.

"Q. What was the nature of the delusions that you saw in May, 1911, or the latter part of April?

"A. She had delusions about people in the wardrobe disturbing her so she could not sleep; there was. no distinct individuals; she had delusions of animals, principally rats in the room; she was continually troubled with something in her mouth.

"Q. What did she say it was?

"A. Well, hair, snakes, or something like that, threads, something along that line.

"Q. And how would she try to remove it from her mouth?

"A. By spitting and by pulling at her tongue or mouth and by running her fingers in her mouth; and coloration of her hands.

"Q. What about the coloration of her hands, what did she say about that?

"A. 'Look at the black and blue spots on my hands.'

"Q. And how about the discoloration of her face?

"A. She complained of her face being discolored once in a while."

At the request of Dr. Stearns, Dr. House, a specialist, was called and with Dr. Stearns made an examination of Mrs. Faling's mental condition. Dr. House reported to Mr. Strong that, as Mr. Strong states, her condition indicated a "tendency towards paranoia." Dr. Stearns testified as to the result of the examination thus:

"A. Well, we came to the conclusion that she was suffering either from paranoia or a mental condition in which paranoia symptoms greatly predominated.

"Q. Is paranoia a permanent disease, once it affects the mind?

"A. Yes, it is so considered. * *

"Q. In that conversation, or consultation was Mr. Strong advised by Doctor House of the conclusion that you and he had reached concerning Mrs. Faling's mental condition?

"A. He was.

"Q. What did Doctor House think of it?

"A. He said Mrs. Faling was suffering from mental condition which was either paranoia or in which paranoia symptoms greatly predominated and her condition was incurable. * *

"A. Well, I would not say that she had paranoia; I have not made a diagnosis and accepted her case as 'paranoia'; she had delusions, at least when I saw her.

"Q. Well, now let me, in connection with that, in that regard, do you know whether or not she exhibited symptoms, according to your opinion, of any other form of insanity in addition to paranoia?

"A. Yes, she did.

"Q. What form of insanity was that?

"A. She had symptoms, I should judge, of paresis; paresis.

"Q. And were those symptoms, would they be agreeable or in conformity to the diagnosis of paresis?

"A. Well, she had certain prodomal symptoms, or the beginning of symptoms; one thing in particular in regard to her person, in part in regard to her dress and clothes; ordinarily in paresis you have visions of grandeur and things of that sort; I don't know as she had this particular thing when I saw her, but those were some of them.

"Q. How about looseness of thought and disconnection of ideas, and inability to complete sentences, are those symptoms of paresis?

"A. Yes, that could be or would be symptoms of paresis."

It was thought best and arrangements were made to remove Mrs. Faling from the Sargent Hotel to a more quiet place. A cottage at Irvington was rented for her for three months, so that she would have better care and nourishment. Miss Jennie Miller, a friend of Mrs. Faling, came to assume care of her and was furnished $1,100 in checks to pay expenses. Mrs. Faling was dissatisfied at Irvington, especially with the manner of incurring expenses, and thought she was in jail. After she was there about a week or ten days Miss Reed, a Portland teacher and friend of Mrs. Faling, called to see her. Mrs. Faling, without the knowledge of her attendants, returned with Miss Reed at the Sargent Hotel, where she lived until the

last of September, 1914. She refused to go back to Irvington.

The testimony shows that during the summer of 1911, Mrs. Faling's physical and mental condition was much improved. She wrote rational letters and attended to her business. In August, 1911, Dr. Stearns states her mental condition was "considerably improved." The $1,100 expense money was accounted for by Miss Miller and $382.82 returned to Mrs. Faling. Commenting upon her sickness and the expenses in a letter to Mr. William E. Metzger, she wrote that she did not think she would be sick again as it was too expensive. Mrs. Faling while living at the Sargent was very economical, in fact penurious in regard to her personal expenses; she would often obtain cheap meals at a near-by bakery for herself and her nurse. Her room was $30 and meals averaged $20 per month.

Mrs. Faling solicited and obtained the advice of Mrs. Waldo in regard to the disposition of her property. Mrs. Waldo suggested several charitable institutions as worthy of her bounty. It is believed that the will of 1911 reflects the friendly advice of Mrs. Waldo. This will and the codicils thereto were drawn with painstaking care by Mr. Strong, who for years had been her legal adviser and had assisted her in nearly all of her business undertakings and was familiar with her ways and desires. She appeared at his office, and the execution of the will was superintended by him in a legal manner. Mrs. Faling continued to call in person at Mr. Strong's office for consultation and advice until November 13, 1913. This is shown by daily business memorandums carefully kept by Mr. Strong for a number of years. Those relating to the business of Mrs. Faling are contained in

the record. While it is conceded that at the time of the execution of the will of August 25, 1911, and the codicils thereto, the last one being dated June 6, 1914, Mrs. Faling was competent to make a will, it does not follow that she was at all times mentally responsible during that period. It is necessary to consider the testimony as to her mental capacity at the date of the will of August 26, 1915.

Charles E. Moreland, a dentist, who witnessed the 1915 will is a brother of Mrs. Catherine Becker named as a beneficiary in the will. He was called to witness the will at the Multnomah Hotel by Mr. Mead. He testified on behalf of proponents as to the formal signing of the will: that Miss Chattin, the nurse, Lydia Metzger, another witness to the will and Mr. Mead were there at the time; that he talked with Mrs. Faling and her mind and memory were sound; that he did not notice anything out of the ordinary about Mrs. Faling; that he had boarded at the same house with Mrs. Faling several years before, but had not seen her for over ten years; that her hand was very unsteady and she was weaker from age; that she did not discuss the will; and that he did not ask why she had a nurse.

Miss Lydia A. Metzger, a witness for proponents, testified that she had signed the will as a witness. At that time she was a public stenographer and had a desk in Mr. Mead's office. In addition to relating the formal signing of the will she testified:

"Q. I will ask you whether or not at the time Mrs. Faling signed that will, her mind and memory was sufficiently sound to know and understand the business she was engaged in, at the time she executed the will? * *

"A. Yes, sir.

"Q. I will ask you whether or not at that time she was acting freely and voluntarily and,—
Witness interrupting;
"A. Yes, sir."

Miss Metzger stated that she is a sister of William E. Metzger and first knew Mrs. Faling in 1910, and called on her quite frequently after that; that Mrs. Faling was sick about 1911, had the palsy; that in 1916, her mental condition was worse, "sometimes she seemed to know me, sometimes she would not"; and that there was a marked difference in Mrs. Faling's condition in the summer and fall of 1916. On cross-examination this witness testified:

"Q. She always knew you at the Multnomah Hotel?
"A. She always knew me, except when she was ill; she was sick there at the Multnomah, and once or twice she was in bed when I called, and I would not stay long you know.
"Q. My question was, 'Did she know you at the Multnomah Hotel?'
"A. There was once or twice that maybe that she didn't.
"Q. And that was in 1914, was it not?
"A. No, in 1915.
"Q. She went to the Multnomah Hotel in 1914, did she not?
"A. She went to the Multnomah Hotel in January, 1915, or let me see,—the latter part of November, 1914, I can't say definitely, I think the latter part of 1914. * *
"Q. And the next place you saw her after she left Sellwood was at the Multnomah Hotel?
"A. Yes, sir.
"Q. What was her condition there, then?
"A. I couldn't see any material difference; I couldn't see any particular change; maybe a little older, is all.
"Q. You think her condition then was about on the average as to what it had been before?

"A. Yes, sir.

"Q. You think her condition at the Multnomah was about the same as it had been?

"A. Yes, except she was a little older, aged a little.

"Q. You never knew or never saw, you never knew she had sickness of any kind at the Multnomah?

"A. On one or two occasions when I called she was not well, she was delirious.

"Q. When delirious what did she say, or what did she do?

"A. Just the same as anyone would.

"Q. Did she mention Lilly?

"A. Well, perhaps she did, I can't say probably she did; I never stayed very long when she was ill; I can't really tell. * *

"Q. Do you remember any particular time when she was sick and didn't know you?

"A. Well, I remember there was one time, on one or two occasions when I went to see her she didn't remember my name; she was sick at that time.

"Q. When do you think it was when she was sick and didn't remember your name?

"A. I think the latter part of nineteen and fourteen or the early part of nineteen and fifteen; I don't know whether it was the latter part of nineteen and fourteen or the early part of nineteen and fifteen, it was right close there anyway, once or twice she was lying in bed ill and I would go to the bedside and she would probably look at me and say how are you and I would say how do you do, but she wouldn't call me by name, she apparently at the time didn't remember my name, or couldn't speak my name."

In regard to the time of signing the 1915 will this witness states further:

"Q. Where was she when you came into the room?

"A. She was sitting down.

"Q. Sitting down when you came in?

"A. Yes, sir.

"Q. Whereabouts was she sitting down, when you came in?

"A. If I remember correctly she was sitting on the cot.

"A. Well, do you remember correctly?

"A. I think so.

"Q. Well you are testifying she was sitting on the cot?

"A. Yes, sir.

"Q. How long did she sit there?

"A. Until Mr. Moreland came in.

"Q. Well, that would be about twenty minutes then?

"A. Yes, I guess that was about it.

"Q. Well, was she sitting in an upright position?

"A. Yes, sir.

"Q. Anyone sitting by her to assist her in sitting up?

"A. No, sir.

"Q. And then she walked over to the table and—

"A. Walked over to the table and sat down.

"Q. And no one assisted her to do that?

"A. No, sir.

"Q. She had no assistance?

"A. No, sir.

"Q. And then just sat down and signed the will?

"A. Yes, sir.

"Q. And nobody told her what to do?

"A. No, sir.

"Q. And nobody told her where to sign, or anything of that kind, or how to sign her name?

"A. Well, I believe Mr. Mead told her to sign Xarifa J. Faling, but I am not sure; I couldn't say."

Mrs. Clara N. Waldo, a witness for proponents, testified to the purport that she knew Mrs. Faling first in 1904. Mrs. Waldo and her husband lived at the Sargent Hotel until 1908. In 1907, Mrs. Faling talked about her will and listed several charities. Mrs. Waldo testified:

"A. In 1911, I remember we had another conversation about her will, and at that time we talked about the Old People's Home which was built by Mrs.

Mann, and was opened in the spring of 1911, and I told Mrs. Faling I had furnished a room at the Old People's Home and asked her if she would not like to help Mrs. Mann do something. She liked the idea very well, and she was interested in it. She said she would take it under consideration. At that time I said to Mrs. Faling, 'How would you like to put all your property, everything you have, into one big institution, philanthropic institution, just as Mrs. Mann has done? That is a monument to Mr. and Mrs. Mann that will continue for many years.'

"Q. That was P. J. Mann?

"A. Yes. This Old People's Home is situated out at Rose City Park, and Mrs. Faling said, 'Well,' she said, 'there is no big thing left that I want to do; it has all been done.' Very like her, too, to turn it off. * *

"Q. Do you remember when Mrs. Faling went to Irvington in 1911?

"A. You mean after she had a stroke and went out there.

"Q. Yes.

"A. I never saw her when she went out after she left the Sargent I did not see her in that cottage. I don't remember the date of that stroke at all, but I know I was there about three days afterwards, when she was—just went in and out and stayed a few minutes,—when she was in a very weakened and bad condition; but I remember being at the Sargent the next day after Mrs. Faling returned. She was sitting around with things unpacked and the pictures were not hung, and nothing was in order, and she had just gotten back.

"Q. What did she say to you then?

"A. She said, 'You know Mr. Strong thought I would be happier in a home. He thought I would be more comfortable out there, but I simply could not stand it.' Then she did not tell me any of the particulars why she couldn't stand it, but she said, 'There was so much brought in; so much ordered. The whole kitchen table was full of supplies. Some-

times twice a day the grocer would come there'; and she said, 'For years I have been getting my breakfast for fifteen cents,' and she said, 'I couldn't stand it.'

"Q. What was the condition of her mind—

"A. (Interrupting.) Oh, she knew what she was about. She was perfectly clear. She simply thought it did not pay her to try the experiment further, because it cost too much, and she wasn't any more comfortable, so she simply dropped the subject."

Mrs. Waldo stated that she came from Europe in the fall of 1912, and saw Mrs. Faling and noticed no change in her except physically. Mrs. Waldo sailed again for Europe in March, 1913, and came back to Portland in the late spring of 1914. She did not see Mrs. Faling until November of that year.

"Q. When and where, and under what circumstances did you see Mrs. Faling?

"A. In November, 1914,—I had lost track of her. I did not know where she was in the summer of 1914, and I was not very well, but I heard at last that she was at the Multnomah Hotel, and I went there very soon to see her. We were out in the automobile, my mother and my two sisters and myself, and one sister stayed in the car, and the other, the youngest one, went with mother and me upstairs. A nurse opened the door for us, and we went in. Mrs. Faling was not in the room when we went in there, but she walked in shortly afterwards and I received a shock from seeing how much she shook and trembled. I felt a distinct shock at the physical disability which I noticed. When she came in she shook hands with us all around and said, 'It is a long time since I have seen you.' She did not call my mother by name. She did not call me by name and did not call my sister by name and did not call my mother by name when she first came in. I felt sure that she knew me by a remark she made the minute we were seated. It showed to me she knew me perfectly well. She said, 'Is your boy there yet? You know my boy left in a hurry,' and my mother and sister looked astounded.

They did not know what she was talking about. I knew perfectly well. She thought about William Metzger, and the boys being off to college, and that was the first thing that came in her memory when she saw me, and so she asked those questions. Then she spoke of William Metzger. She said, I think she had a picture of William Metzger's wife, and it seems to me of the baby. She had something that she brought out to show me that she had received from William Metzger. * *

"Q. Were these statements of hers agreeable to your notion of the facts?

"A. Well, yes; because she said to me, she said, 'I seldom leave the hotel now. I just stay right here. I take my exercise in the corridor, and the nurse has to walk with me, I am so bad. I never go down to the dining-room. I don't like to have people see me eat,' and she talked to me about her condition, and how she liked the hotel, and she talked a great deal about how she felt, and how she was; and when we went out the nurse—I dropped behind, and I said to the nurse, 'How is Mrs. Faling? She looks very weak to me, and very feeble,' and the nurse said, 'You are seeing her on one of her good days. She slept well last night, and feels as well as she does usually; better, perhaps, than some days.'

"Q. You never heard her mention Mr. Mead?

"A. We never discussed Mr. Mead. I did not know him. She may have mentioned him. She mentioned other people to me I did not know. We never discussed him. She never mentioned him in relation to any business affair whatever.

"Q. Do you recall, to refresh your memory, having a talk with Mr. Smith, a son of Dr. Tyler Smith—

"A. (Interrupting.) Oh, in Los Angeles, lately?

"Q. Yes.

"A. Yes, I do.

"Q. Do you recall you said you were astounded when you saw that Mr. Mead had been favored—

"A. (Interrupting). Yes, I said that was a new proposition to me, because she talked to me about the will and never mentioned Mr. Mead."

Dr. Carlo Visetti, a witness for proponents, testified to the effect that he treated Mrs. Faling from 1912, until she died. In about a year after he commenced to visit her she commenced to decline physically. He treated her for paralysis agitans. About the fall of 1913, she ceased to go outside and had her meals brought to her room. After Mrs. Faling moved to Sellwood he visited her three times a week and sometimes oftener until she died. Other physicians were called in at times. While she was at the Multnomah Hotel she had embolism of the brain, or clot of blood on the brain. By referring to his book he first states it was August 27, 1915, and afterwards that it was January 15, 1916. He stated that absorption took place and she fully recovered in less than a month. After the fall of 1913, she was unable to walk very far without assistance, "because she would lose her center of gravity" and there was danger of her falling. Dr. Visetti states that in his opinion she was able to make a will in August, 1915.

"A. I never did observe any symptoms of delusion, illusion or hallucination, or mental insanity in Mrs. Faling. * *

"Q. Did any of the nurses ever report to you that Mrs. Faling was mentally disturbed?

"A. No, never."

Dr. Visetti states he does not speak good English. On cross-examination this witness testified thus:

"Q. What is the difference between senile shaking and paralysis agitans?

"A. For instance, the senile shaking affects especially the head.

"Q. Whereas in paralysis agitans, the head ordinarily is stiffened, instead of shaking, isn't it?

"A. Yes.

"Q. So if a patient has considerable shaking of the head, you look for something further than paralysis agitans?

"A. Yes.

"Q. And this senile shaking is associated with the brain, and conditions of the brain?

"A. Well, I can't tell this. I am not expert in this. I can't tell.

"Q. You would defer in that matter to doctors who do make a speciality of those matters?

"A. Yes. * *

"Q. So, according to Charcot, they should take them out to ride?

"A. I did direct it sometimes. She did not seem to be relieved. I asked her if she was relieved when she took the street-car, and she said to me she was worse. * *

"Q. If she had a senile shaking, which is an affection of the brain, she would not want to go riding?

"A. She has not any senile shaking. She has paralysis agitans shaking.

"Q. We will see about what she had. I asked you a hypothetical question. If she had senile shaking, then she would not have enjoyed riding, would she?

"A. No.

"Q. If she had paralysis agitans, according to your book, riding in a carriage would have brought some relief?

"A. Yes."

Etna B. Chattin (Fuller), a nurse for Mrs. Faling from November 31, 1914, until Mrs. Faling died, and named as a beneficiary in the 1915 will, as a witness for proponents testified that when she went there Miss Stein the other nurse told her not to wear a uniform as Mrs. Faling did not like trained nurses. Mrs. Faling could not then walk very well, her knees would shake, she needed watching closely or she would fall. She had "paralysis agitans" or palsy, could not dress herself, had to be fed sometimes, the first year, November, 1914, to November, 1915, she fed herself most of the time. Her mind was normal, she knew exactly what she wanted. In June, 1915, at

the Multnomah Hotel Mrs. Faling was quite ill, "she had one of those nervous spells with severe headache * * and after these headaches she would sleep for two or three days, day and night and many times she would look like a dead person * * then after these sleeping spells she would be as bright and strong as could be; during these sleeping spells of course it would be different." No card or chart was kept by the nurses to report to the attending physician. On cross-examination Miss Chattin testified:

"Q. What did she say on the subject of 'relations' at any time?

"A. Mrs. Faling, one afternoon was lying on the cot and I was sitting beside her and we were talking, and she said something about a will; I asked her about her brother and I said 'Is he really your brother?' And she said 'I don't think so; the court says he is; I don't think he is' and something she said about his guardian, and then I said 'Well, really, haven't you any relatives anywhere?' and she said, 'When I buried my grandson that was the last relative I have,' and I said 'Haven't you any cousins or anything of that sort?' and she said, 'No,' and I said, 'Oh well, I suppose when you die some relatives will show up,' and she says, 'I suppose so and the only thing I will be sorry for is that I can't be here to see the fight.'

"Q. Now do you remember where that conversation was?

"A. At the Multnomah Hotel.

"Q. What time of the year was it?

"A. Before the will was made in August, because it was after I came back from my vacation and she was lying on the cot and I was sitting beside her talking to her. * *

"Q. Well, as far as her mind was concerned, she was always a bright woman was she?

"A. Yes, she was always a bright woman; of course her mental condition was not so good during the later part of nineteen and sixteen and seventeen, up to the time of her death, but I know,— * *

"A. (Continued.)   Sometimes when she had these severe headaches her mind was not as bright or keen as it was at other times, but she was never insane; of course during the later part her mind was not so bright, that is it was not so keen; and she was aging. * *

"Q. Well, this last year, will you tell me what was wrong with her?

"A. Well, this last year somewhat mentally yes, on account of her age, I think."

From November, 1914, Mrs. Faling had two nurses, one day and one night nurse.   Miss Chattin further stated in effect: Sometimes she called me Lilly.   "She could never sit in a chair long on account of her head paining her," never took her out of the hotel, she walked in the corridor and out on the fire-escape. Mrs. Faling drank tea and coffee with a tube; sometimes out of a cup.   "I had money to pay for things around there."   After she went there she wrote Mrs. Faling's letters.   She had trouble in learning the addresses of Mrs. Faling's friends.   Mr. Fuller, her husband, took his meals there at the rooms occasionally.   Mrs. Faling was always talking about turning the gas out after she went to bed.   Miss Chattin testified:

"Q. Whenever Mrs. Jensen called, and Mrs. Faling was awake, did Mrs. Faling recognize her instantly?

"A. Not always.   Once in a while she did, but not always.

"Q. Once in a while she did recognize her when she was awake, but not always?

"A. Not always.

"Q. Why didn't she recognize her?

"A. She did, after a very few minutes.   Mrs. Faling's eyesight was not very good. * *

"Q. I understood you to detail yesterday after she had that sickness that she slept for three days, and got up, and was bright?

"A. I did when she had the nervous spells, with her head. Then she slept three days, and then she got up after the third day and her mind was quite clear, and she walked.

"Q. And it continued quite clear for months, by reason of having had the sick spell?

"A. Not for months. Sometimes it was a month and sometimes longer; but during the time she had this in May, this sick spell, she did not have any other headache that I can remember of until towards fall, some time in October, or some months after. But that was the longest period Mrs. Faling had ever gone without having headaches and one of these nervous spells."

Miss Chattin testified that talk about the will started soon after she went there. She said Mr. Mead called in the afternoon and they talked over what was to be done in regard to the will and then for two afternoons Mrs. Faling practiced writing "Xarifa J. Faling." Miss Chattin testified that she did not remain in the room when the will was signed. Miss Chattin is contradicted in many important particulars by several witnesses.

C. Lewis Mead, one of the proponents, testified that he had known Mrs. Faling since 1892, and as follows:

"Q. When did you first learn she was insane?

"A. I never learned that.

"Q. Never observed any peculiarities in her conduct, did you?

"A. Well, I can't say that I did,—that made me believe she was insane.

"Q. As far as you knew she had complete possession of her faculties, mental faculties, down to the time she died,—is that true?

"A. Yes; that is the way I would answer that question, 'yes.' I saw her the day before she died; I

called on her; I had gone up again and she was lying in bed; the nurses or somebody telephoned me that I was wanted at the Mult—Imperial Hotel; anyway I went up; it was about four o'clock if I remember right, and the nurses said Mrs. Faling had been very sick and was very sick then and I went into the room and she was looking very badly and I spoke to her and said—'You are looking pretty thin; are you getting enough to eat,' and she said, 'I am too sick to eat.' * *

"Q. And you think she was perfectly sane, do you?

"A. Yes, sir.

"Q. Nothing to indicate there was any mental trouble with her?

"A. No, sir."

On this point Mr. Mead is at variance with the testimony of Dr. Carlo Visetti who is a friendly witness for proponents and testified as follows:

"Q. Well, I understood you to say in your former examination that four or five or six days before Mrs. Faling died that she was unable to recognize you, is that right?

"A. Yes, sir.

"Q. She was unconscious?

"A. Yes, sir. * *

"Q. Referring to this condition which you say existed four or five days before she died, you said that was a state of coma?

"A. Yes, sir.

"Q. And she was entirely unconscious?

"A. Yes, sir.

"Q. And would not see you or recognize you at all?

"A. Yes, sir.

"Q. And that condition continued until she died?

"A. Yes, sir, for four or five days before she died.

"Q. I will ask you if on the day before she died, this could happen. A person called on her about 4 o'clock and went into the room and she was in the room and looking very thin, and I said to her, 'You are looking pretty thin, are you getting enough to

eat?' and she said, 'I am too sick to eat,' Could that have. happened?

"A. No, I could not tell you, but it might be; no, she was unconscious, it couldn't.

"Q. She was entirely unconscious?

"A. Yes, sir.

"Q. And that couldn't have happened?

"A. No."

Mrs. Geraldine C. Ridley, a witness for contestants who was a nurse for Mrs. Faling in June, 1915, testified:

"Q. And did you call Mead the day, or the day before she died?

"A. Yes, he was up there, the day before she died.

"Q. The day before she died?

"A. Yes.

"Q. Did you see him there?

"A. Yes.

"Q. What occurred?

"A. He went into the bedroom and she was in a state of coma, very ill, and he looked at her and said, 'I never saw her look so bad, and I think this is the last,' that was all.

"Q. Did she hold any conversation with Mr. Mead?

"A. Why she couldn't have done such a thing, no;. she was in a state of coma."

Mrs. Frances Olive Jensen, witness for contestants, one of the beneficiaries named in the 1911 will, and an old friend of Mrs. Faling, testified that during June of 1915, she had a conversation with Mead as follows:

"Mr. Mead asked me if I had been to see Mrs. Faling and I said no, but I am going, and Mr. Mead said, 'It is too bad she cannot die,' and I said 'Why should she die?' and he said, 'because she is of no use to herself or to anyone else.' "

Miss Helen M. McDonald, a witness for contestants, who was a nurse for Mrs. Faling, testified:

"Q. Now coming up to the time of July, nineteen fifteen, you were there as day nurse from substantially the 1st of July until the first of August, 1915, is that correct?

"A. Yes, sir.

"Q. Do you recall whether or not Mr. C. L. Mead called on her there at any time during that month?

"A. Yes, sir, very often.

"Q. How often did he call?

"A. Well, I couldn't say how often, he called pretty often. Sometimes when he called and I was trying to control her, trying to get control of her, he would call there then and I couldn't do or control her, so well when he was around, and he would leave; sometimes he called in the morning and sometimes he called in the afternoon."

She testified concerning some flowers which Mr. Mead had brought up:

"Q. Did you pick up the flowers and take them to her and show them to her?

"A. Yes, I did. I sat them on the dresser and she said, 'Isn't that a pretty cat?' and I said, 'There are some flowers that Mr. Mead has brought you.'

"Q. After you put them on the dresser how long did she continue talking about them?

"A. Well, she would look over there and she said, 'That is a fine or a nice cat, a pretty cat on the dresser.'

"Q. Was Mr. Mead there at that time, and didn't he hear it, and wasn't he within hearing?

"A. Why, yes.

"Q. When Mr. Mead was there in July, 1915, whether or not you heard Mrs. Faling talking to him in substance that she was now already to move, that she was going to move, and that she had everything packed up and everything to move, anything in substance like that?

"A. Very often she did tell him she was packed up and ready to move and was going to move.

"Q. And what did Mr. Mead say?

"A. Smiled.

"Q. Now, were there times during that month when Mr. Mead called when she was uncontrollable, you couldn't control and she was like you have stated?

"A. Yes, Mr. Mead came in when she did that.

"Q. At these times when Mr. Mead came in and she was chasing things around the room, would he stay there?

"A. Well, he would come in but he always left when she got to running around the room and chasing things, he always left. * *

"Q. At times when Mr. Mead was there in July, nineteen hundred and sixteen whether you heard Mrs. Faling talk to a supposed old woman in the clock?

"A. Yes, she would walk up to the clock that stood on the writing desk and say, 'How are you to-day?' 'Are you very well?' 'That is good.'

"Q. Was Mr. Mead there at any of these times?

"A. Yes, he would be sitting in a chair.

"Q. What would he say or do?

"A. He wouldn't say anything.

"Q. Now during these times that Mr. Mead called on Mrs. Faling or went there in July, 1916, did Mr. Mead hold any conversation with her or talk business matters of any kind with her?

"A. No. She was unable to hold or carry on a conversation, no one could carry on a conversation with her at all, no one could carry on a conversation with her whatever.

"Q. When he called there, did he ever carry on a conversation?

"A. I never heard him."

This was in the month of July, just preceding the claimed execution of the 1915 will. Miss McDonald also testified:

"Q. Was there any other person besides yourself that relieved Miss Chattin in the daytime at any time, other than yourself?

"A. Yes, she informed me that Mr. Mead relieved her sometimes in the afternoon when she was tired and wanted to rest in the afternoon."

Sarah Allen Gray, a witness for contestants, testified:

"A. My husband and I called on Mrs. Faling at the Imperial Hotel, in February, 1917; we were admitted to the room by Miss Chattin; Mrs. Faling was lying on a couch partly upright—that is the couch had some attachment or arrangement whereby she was reclining in an upright position, not lying down but reclining in an upright position; we went to Mrs. Faling's couch and my husband took her hand and tried to get her to recognize him; he told her who he was and when she didn't seem to recognize him he asked if she remembered the Gray family, if she remembered Francis Gray, Pidge Gray and Alice Gray, and then the nurse interrogated Mrs. Faling and asked her if she didn't remember the Grays of San Francisco, but there was not the faintest sign of recognition in Mrs. Faling's eyes or face. * *

"A. I don't remember the exact words that Miss Chattin said, but she gave us to understand that Mrs. Faling was mentally incompetent."

She said that they carried on a long conversation about Mrs. Faling in her presence with Miss Chattin, and detailed the San Francisco murder trial; and further testified:

"A. Mrs. Faling paid no attention whatever, she just lay in that helpless state paying no attention nor heed to anything that was said. * *

"A. Well, Miss Chattin said that at the time she took charge of Mrs. Faling, Mrs. Faling didn't have a single decent garment to put on and I think it was Mr. Strong told her to go down and get an order of wearing apparel for Mrs. Faling, and which was done, and it so angered Mrs. Faling that the first garment that was put on her she tore it into shreds.

"Q. Was that said in the presence and hearing of Mrs. Faling?

"A. It was."

C. L. Mead testified that on October 27, 1914, Mrs. Faling said, "I want you to look after my affairs and see that I get a good place and look after my affairs in general"; that the first time he heard Mrs. Faling talk about a will was about June, 1914, and the next time was when she was at Sellwood; that she wanted to make her will a short time before he went to San Francisco about February, 1915; that he hardly knew she really meant it; that he had another conversation with her in March and told her he was going to San Francisco, she said, "I wanted to see about making out this will," and he said, "Well, I am going to San Francisco to-morrow and we can attend to that when I come back," if she wanted him to see about it, he told her she would live a long time, "she had a sick spell shortly before that" but he did not recall that it took a month for her to get up and around.

"Q. No, but her arm was paralyzed, do you recall that?

"A. Well she may have had some little trouble on one side of her body; it didn't lay her out completely, she was up and around.

"Q. Don't you know in talking to her at that time that she was in a weakened condition and that she was recovering from a paralytic stroke?

"A. I recall she had a sick spell some time before, but I thought nothing of that; I thought with her advantages and accommodations and conveniences there at the Multnomah Hotel that she would continue to rally as she had on previous times and be all right.

"Q. Have you any reason to suppose that you were mentioned in a previous will?

"A. No, sir."

Mr. Mead also testified in effect: In February, 1915, she said she wanted some glasses to look into the matter, wanted to make a will and look over some papers. He talked with her in regard to taking over a mortgage on the Imperial Hotel property for $50,000 given by his wife, that Mrs. Faling had mentioned several times previous. It was held by the Security Savings and Trust Company. On October 15, 1914, she said she would like to take it over, and told him to see Mr. Strong and have him arrange the papers. He reported that to Mr. Strong, and the second time he saw him he said it would be all right and she took it over. In May, 1915, Mr. Mead states he returned from California. On August 21, 1915,

"she wanted to get ready to make out this will * * she said, 'The first thing I had been thinking about, I want to do, is to make out my new will and I want you to make it out, want you to make out my will next week.' * * Well, I said that Mrs. Wells had had Judge Northrup to make out her will and Mrs. Faling said well I can make out my own will and you can make it, and I don't want any lawyers; you can get the papers at any book store and go to Gills, and I said, 'All right, I will attend to it next week, sure.' She seemed to think that was all right.

"A. Well, the following Monday, as I remember, I came over town rather late and did the marketing and went to my office; I went down to the market on Fourth and Alder Street and went over to the Gills Book Store and inquired for blank forms and,

"Q. (Interrupting.) How many did you buy?

"A. I bought three; * * for a quarter. * * Tuesday I called on Mrs. Faling at the Multnomah Hotel and took one of these sample blanks along and when I came into the room; she was in the room there somewhere, and when I came in she said I expected you here yesterday instead of today and it would be all right though and she closed the door and sat down close to the window and said, 'Did you get the will

105 Or.—26

or papers?' and I said, 'Yes, I got this special form' and took out this form, I had it in my pocket, and I said, 'It is a special form,' and read it over.

"Q. Did you hand the form to her?

"A. I did and she looked it over and said that is all right.

"Q. Did she have her glasses on then, if you know?

"A. I don't know, I don't think she did; I took out the form and read it over to her and she said, 'That is what I want.'

"Q. Did you read the entire form to her?

"A. I read the writing or the printing. * * I read this form over to her and she said, 'That is what I want and it is all right' and I started in to fill out the names 'X. J. Faling,'—

"Q. (Interrupting.) What did you have, a pen or pencil in your hand?

"A. (Continued.) Yes, I think I had a lead pencil, I wrote the name of Xarifa J. Faling, I wrote in name,—the name of the town, Portland, State of Oregon and I said, 'The next thing will be the age'; she sort of hesitated about the age part of it, and I said, 'You are about seventy years of age,' and she said, 'Do I look to be seventy years of age?' and I said, 'I don't know'; she said put down the age at 'sixty-eight' and re-read the wording 'Being of sound and disposing mind and memory' and when I did that she smiled, or rather said that the lawyers at San Francisco at one time tried to make out her mind was twisted but that was for a purpose.

"Q. What did you do?

"A. (Continued.) She said it was all right at this time and I said, 'I will make it read 'At this time,' and she said yes and I went on reading it on down. * * I read the first clause * * then I said, 'Now this is the second clause or bequest,' and she said 'I want to make several gifts of three thousand dollars each so there will be no jealousy, I want to give that to each,' and I said 'All right, who are they?' and she said 'The first one to give or remember the Beaverton Children's Home; that is a good place where children can be raised in the country, that is a good place, and

I also want to remember the St. Agnes Baby Home, dear little things.' "

She then mentioned "The Children's Home at Corbett and Gains Street"; she called these names off and Mr. Mead made a memorandum on one of these blank forms, partly on that day and the remainder on the next. Mead on cross-examination stated that Mrs. Faling was not capable of transacting business for two weeks and not always for two months before she died. He states, "I don't remember whether a complete mental incompetency existed very long before she died, perhaps, might of been, well I wouldn't hardly state the time, three or four months, or maybe a little longer."

Mr. Thomas N. Strong, one of the proponents, testified among various other things that he had been attorney for Mrs. Faling for forty-three years, and mentioned her trouble in San Francisco when in a moment of frenzy she shot her husband. He detailed from his office memorandum the writing and execution of the will of August 25, 1911, and the codicils thereto and many other transactions. He states that he drew several wills for her before that one. Mr. Strong says in substance that about February, 1915, Mrs. Faling told him she would like to make a new will and remember him and Mr. Mead in it.

"I simply said I preferred not to draw it under the circumstances. I had been her attorney for so many years I thought it would not be wise for me to do it. * *

"Q. Very well; when she wanted the will drawn, what did you do towards carrying out her wishes?

"A. I laughed, and passed the question by.

"Q. Did you suggest, on account of it not being proper for you to draw it, that she might have Mr. Labbe draw it?

"A. I told her she might get another lawyer, or get it done somewhere else.

"Q. Did you see whether she did get anyone else or not?

"A. No, I thought it was none of my business."

He states that he advised making the loan of $50,000 to Mrs. Mead and that it was wise to make the loan. The following notation appears in Mr. Strong's memorandum under date of September 6, 1915:

"Long talk with C. Lewis Mead about her will; and gave me what purports to be copy of one executed by her a few days, of which he has original at his house. Talked over her affairs and expenses, and so forth."

Mr. Mead exhibited a copy of the August 26, 1915, will to Mr. Strong. The latter states:

"Q. The fact he brought in an unsigned copy, a typewritten copy, unsigned, with not even the names of the witnesses written in or filled in, that would not have been any evidence of a will having been executed?

"A. With what she told me, and the fact that I cross-examined him closely as to the method of execution, and how it was done, and held back my judgment on the matter, and made arrangements with him to put it in a safety deposit vault."

Further on in his cross-examination he states in regard to the talk with Mead:

"A. I just satisfied myself it was all right, and we dropped that subject. I inquired of him what condition she was in, and different things in connection with it. The conversation that would naturally come up under such circumstances. * * * I cross-examined him about the will; principally about Mrs. Faling, and so forth and so on. * *

"Q. At the time you had these consultations with Mr. Mead on September 6th, 1915, did he give you any reason why Carl Sheick was mentioned in the will?

"A. I don't remember; I think in the interest of good feeling,—not good feeling toward Carl Sheick by Mrs. Faling, but encouraging good feeling between her and Carl Sheick, but I don't remember just what was said.

"Q. Well, you recall that there was no good feeling between them?

"A. I recall there was no particularly good feeling, but they wanted to encourage good feeling.

"Q. What had she done in the ten years previous to encourage good feeling?

"A. She had not done anything.

"Q. And he had not done anything either?

"A. No, he had not, there was no appearance of it anyway."

Mr. Strong stated that Mr. Mead informed him that Mrs. Faling wanted to make a will, and he replied, "That is her privilege."

The particular period to which reference may pertinently be made is the time Mrs. Faling was at Sellwood for about a month in the fall of 1914, and while she lived at the Multnomah Hotel from the first of November, 1914, until January, 1916, when she was moved to the Imperial Hotel. Miss Stein was a nurse for Mrs. Faling from some time in 1912, until December, 1914. She died December 15, 1914. Mrs. Etna B. Fuller, whose maiden and nurse name as it appears in the record, is Etna B. Chattin, was called as night nurse for Mrs. Faling November 31, 1914, and after Miss Stein died she acted as day nurse until Mrs. Faling died. Miss Chattin is named as a beneficiary in the 1915 will. Other nurses were in attendance from time to time who were witnesses. In 1912, Mrs. Faling's paralysis agitans had progressed to such stage that it was difficult for her to write letters, and after that, as William E. Metzger states, Miss Stein wrote her letters for her to him. For the same rea-

son in June, 1914, she authorized the bank where she kept her checking account to honor checks drawn for her by Thomas N. Strong. After that Mrs. Faling signed only ten or fifteen bank checks "for a month or so." Mr. Strong, by virtue of such authority signed her checks. On October 31, 1914, Mrs. Faling executed a power of attorney authorizing Thomas N. Strong

"to make, contract and incur for me any and all bills, expenses and charges that he may deem necessary or advisable for my maintenance and support, and the maintenance and carrying on of any and all household establishment or establishments for me; to engage for me rooms, attendants, board and lodging at houses, hotels, or other establishments and pay for the same out of my funds; to buy or lease houses and household furniture and fittings for me and pay for the same in like manner; to engage for me physicians, employees, nurses and servants and pay them from my funds such sums or wages as he may deem best; and generally to superintend and manage my household and personal affairs and business at his own discretion, for which he may charge and collect a reasonable compensation. I hereby give to said Thos. N. Strong full power in the premises to manage my business and personal affairs as he may deem best for me."

This was signed X. J. Faling in the presence of Annie W. Stein. It was planned by Mr. Strong and Mrs. Faling's friends that Mrs. Faling should have better accommodations and care and expend more of her means for her own comfort than she had formerly. Mr. Strong was limited in her expenditures only by the amount of her income which was about $16,000 a year. After this power of attorney was given the only signatures made by Mrs. Faling were to the purported will of 1915 and some income returns which

were prepared by Mr. Strong.   Mrs. Faling was prac-
tically relieved of all her business cares, personal ex-
penses and arrangements, which were carefully at-
tended to or supervised by Mr. Strong.

Prior to this time, about September, 1914, it had
been arranged for Mrs. Faling to live at the house of
her friend Mrs. Catherine Becker at Sellwood.   While
there she was under the care of Mrs. Becker and
Annie W. Stein, her nurse.   She remained there until
October 31st.   While there some of her friends visited
her.   Dr. Stearns testified in effect that in 1914, he
happened to be in the cottage where Mrs. Faling was
staying at Sellwood; that her condition was different
then.   He did not make any examination; he spoke to
her and she did not seem to recognize him.   Just
from what he saw he would say that she did not take
any interest in things or know what was going on
about her.   The accommodations at Sellwood were not
satisfactory.   The house was small and the last of
October Mr. Mead, after talking with Mrs. Faling,
procured a suite of three rooms at the Multnomah
Hotel for Mrs. Faling and her nurses.

After William E. Metzger left Oregon Agricultural
College he and his wife were in Arkansas for a time
and returned to Portland July 15, 1914.   He visited
Mrs. Faling, and states:

"I found her in poorer health physically than be-
fore I left Portland.
"Q. How did you find her mentally?
"A. Very much the same."

He testified that he visited Mrs. Faling later at
Sellwood; that "she was not so well, physically.   She
had grown very much weaker, and she had her ner-
vousness, as she had before."   Upon inquiry as to her
ability to execute a will he stated, "I think possibly

she could have done that kind of work up until after she was in the Imperial Hotel.''

Mrs. Elizabeth F. Legg, a sister of Miss Stein the nurse, was a witness for contestants, and testified that she first saw Mrs. Faling in 1912. She went to call on her sister Miss Stein at the Sargent Hotel. She saw Mrs. Faling frequently after 1912, until Miss Stein died December 15, 1914. She assisted in caring for her for a while in 1913, and mentioned her having delusions.

"Q. When did she commence to have delusions of that kind?

"A. About the beginning of 1914; the spring of 1914.

"Q. How about the time when you were taking care of her in 1913?

"A. Well, she acted pretty queerly at that time too. * *

"A. When I was bathing her at night she would say that one side of her body was black. I said, 'No, it is not; it is all right. It is just as white as the other side,' and she said, 'No, it is all black' and the next day she referred to the subject several times and said her hand was turning black; the skin on her hand was turning black. And it was perfectly white.''

Mrs. Legg said she saw Mrs. Faling when she was at Sellwood; that her condition seemed to be getting worse all the time; that she saw her at the Multnomah Hotel after she left Sellwood; and that she seemed very weak then both mentally and physically. She further stated:

"I called the day my sister died, in the forenoon of the day my sister died, and when I went in Mrs. Faling came and said, 'Here is the one that will tell us the straight of it. Was it your sister or my daughter that has died?' and I said, 'Why, Mrs. Faling, don't you understand your daughter has been dead some time? It is my sister who has died.' ''

Mrs. Legg testified that Miss Chattin was in the room where she could hear when Mrs. Faling asked her this question as to whether or not it was her daughter that had died. Mrs. Legg called again the day before Christmas. She states:

"I went to get some mail and packages that came to my sister from back home, and she asked me when my sister was coming back, and I said, 'I didn't think she would ever come back.' I said, 'I had come for her mail and packages,' and I gave her some cake that came from Scotland out of a package."

She saw Mrs. Faling again in the spring of 1915; she thought it was Easter Sunday. Mrs. Faling was lying on a couch and did not say much. She did not feel very well that day. She saw her again in August, 1915, when Miss Chattin was away on her vacation. The witness testified:

"A. She was lying down. She was not walking around that day; she was lying on the couch. She did not know me.

"Q. You say she did not know you?

"A. No.

"Q. How do you know?

"A. I asked her if she knew me, and she just looked at me and shook her head.

"Q. What was the expression of her eyes on these trips in 1914 and 1915?

"A. Very vacant. * *

"Q. Did you see her again in the year 1915?

"A. Yes, I saw her about Christmas time that year, too.

"Q. What was her condition then?

"A. She was getting gradually worse. I did not see any improvement in her condition. She seemed to be going down all the time.

"Q. How about talking to herself?

"A. She was talking to herself all the time."

Miss Charlotte Reed, school-teacher, a witness for contestants, testified that she visited Mrs. Faling quite often; that she visited her at Sellwood; that she was invited there for dinner.

"Q. I wish you would explain to his Honor the circumstances of that visit, and the things that occurred.

"A. Well, as near as I can remember she did not talk—she did not seem to know she was out of town; did not seem to know she had moved.

"Q. Just the things she said?

"Mr. Logan: Yes; just the things she said.

"A. I see. She said to us during the dinner, after we had been eating a while, she said, 'Why ladies, there is a gentleman at the table, and no one is looking out for his wants. Won't some of you see that his wants are looked after?'

"Q. Was there any gentleman at the table?

"A. No.

"Q. Who was at the table?

"A. Just the three of us—the four. Mrs. Faling, Miss Stein, Mrs. —— I can't think of her name—Mrs. Becker, and myself; the four of us were at the table. * *

"Q. After she left Sellwood and went to the Multnomah Hotel, did you see her there?

"A. Yes.

"Q. What was her condition then?

"A. Well, just more and more and more. She talked more incoherently and more disconnectedly and seemed to have more wrong notions in her head. And talked about the hotel being hers; her hotel.

"Q. I wish you would tell his Honor what she said about it.

"A. She wanted to know if I didn't like it better than her other house. I didn't know what she meant. She wanted to know if I wouldn't come there and live. Every time I would go there she insisted on my taking a room there for the first three or four months, and had several rooms in mind that would just suit me. Let's see. At one time she told me,— I said, 'I could not afford to live at a place like this,' and she

said, 'Don't tell any other guests in the house,' in a kind of sly way, 'and you can have one of these rooms for nothing,' she says. Another time when she wanted to rent me a room after I had been there a few minutes, and Miss Chattin said to her, 'Why, Mrs. Faling, the rooms are all occupied,' and she said she should mind her own business; that she was not used to having her servants interfere in her business affairs. I think it was some time later she said, 'Come on. There are two rooms upstairs that will just suit you and your mother. Come on and I will show you them,' and Mrs. Faling started out of the door. I could do nothing else but go, and as I got to the door I said to Miss Stein, I said, 'What shall I do?'—

"Q. (Interrupting.)  Miss Stein?

"A. Pardon me; Miss Chattin. I said, 'What shall I do?' and she said, 'I don't know,' and Mrs. Faling opened the door and walked out into the hall, and I followed her, and there was a maid had just gone into a room across, and as we opened this door the maid turned and looked towards us and I said, 'The rooms are all taken upstairs, aren't they?' And she said, 'Yes; the rooms are all taken,' and Mrs. Faling ran into the room as though she had been punished, and sat down and said no more about rooms that day.

"Q. These occurrences you have been talking about, when did they occur with regard to the time Mrs. Faling went to the Multnomah?

"A. Very soon after she went there; very soon after she went there.

"Q. Would that be before the following summer?

"A. Yes; they were right early, when she first went there. Then she seemed to never ask me to come there any more, after three or four months, never talked about that any more, or never asked me to come there any more.

"Q. To go back, now. I will ask you within a short time after Mrs. Faling moved to the Multnomah Hotel whether she said anything to you about the death of any person?

"A. Yes; Miss Stein died. After Miss Stein died I went there one day.

"Q. Tell his Honor about that.

"A. She wanted to know if I knew Lillie had died. I always answered in the affirmative and I said, 'Yes; Miss Chattin has just told me,' and she said, 'I just told them I did not want the funeral to be as expensive this time as it was before. It cost me over three hundred dollars before, and I told them I did not want it to cost me more than thirty dollars this time.'

"Q. Was Miss Chattin there where she could hear that?

"A. I don't know. I don't remember whether she was or not.

"Q. Up to this time, up to the first of 1915, would Mrs. Faling from the time she came back from Sellwood,—would she talk coherently at any time or not?

"A. I heard her on one or two occasions, but I don't remember what she said. She talked, and spoke sanely, and I looked at her quickly thinking that she was able to talk sanely, and I would ask her a question, and she could not keep on the same subject. It seemed to have gone from her mind at that time.

"Q. Do you recall how frequently you visited there in the fall of 1914, down to the spring of 1915, when you say you went away?

"A. I tried—my intentions were to go there once every month to see her.

"Q. And during that period was there any change in her mental condition?

"A. It seemed to be worse and worse and worse and worse; and she had more and more of these ideas and talked more incoherently.

"Q. Do you recall in the spring of 1915, Mrs. Faling pointing out at a place across the street and saying something about it?

"A. Yes; she told me that was her building, too; right over there. She also used to speak about the Multnomah Hotel being surrounded by water. She said the water is coming up all around this building, if you notice it. It is up to the second story already.

"Q. Was there any water there at all?

"A. No, no. * *

"Q. At the Multnomah Hotel, did she say anything to you about an excursion to Vancouver?

"A. Yes; at one time when I went there she told me they had had a delightful excursion; that they had—I don't remember whether it was that day or the day before, that they had had a delightful little excursion over to Vancouver. She said, 'You know it is so convenient. You can put this house right on the boat and go over and back without any inconvenience whatever.'

"Q. Was Miss Chattin present when she told you that?

"A. Yes, Miss Chattin was present.

"Q. Where she could hear it?

"A. Yes. * *

"Q. I will ask you whether or not at the Multnomah, before you went to California in 1915, if you had a conversation with Miss Chattin in which Miss Chattin told you that Mrs. Faling was always talking to an old lady in a clock?

"A. Yes. I remember one day we were sitting in the room and Mrs. Faling walked over by the door and began to talk and I looked over there to see what was the matter and I looked at Miss Chattin and she said, 'She is talking to the old lady in the clock.' 'She is always talking to the old lady in the clock.' That was the conversation in regard to that. * *

"Q. Did Miss Chattin ever tell you Mrs. Faling did not know what she was doing—no; I have got that wrong. I will reframe that. I will ask you, at the Imperial, shortly after Mrs. Faling had moved there, if you had a conversation with Miss Chattin concerning Mrs. Faling having moved, and in this conversation if Miss Chattin told you that Mrs. Faling did not know where she was going; that she was told that she was going out riding with Mr. Mead, and that he was there with an automobile and unbeknownst to her that she was taken to the Imperial?

"As far as I can remember this was the conversation. I was surprised after I found her at the Imperial, and I said, 'How did you get her up here?'

'Did you have any trouble?' and she said, 'No; we did not say anything to her about it. I came up before and got things ready and we didn't say anything about it until she had eaten, and I said, Come on, and Mr. Mead was down with an auto and I told her that we were going for a ride and she got in real quietly and we didn't have any trouble with her at all.'"

Miss Jane Caples stated she called on Mrs. Faling twice at the Multnomah Hotel and saw her once. She had been there two or three months when she called. Miss Caples testified thus:

"A. Why, when I sent my name in, and the nurse said, 'Miss Caples is coming,' of course when I went in she knew who I was. We talked on little indifferent things. She did not call me by any other name until I was going, and she asked me when I had seen Miss Caples. And she asked me at one time—called me Miss Reed once, and I thought that was a natural thing for her to do. She spoke several times that day of people having come to see her that I knew had not been there, and the nurse would look at me with a shake of the head, and point at the head, as much as to say, 'Don't pay any attention; it is not so.'

"Q. Was this after December of nineteen—

"A. (Interrupting.) I really don't know the date, Mr. Burnett. I couldn't tell you. At that time she had been there several months.

"Q. Do you remember Miss Stein?

"A. Yes.

"Q. Was Miss Stein the nurse there then?

"A. No, it was after Miss Stein's death; when did Miss Stein die?

"Q. December, 1914.

"A. Miss Stein was dead at that time. * *

"Q. Did you ever go back to see her after you saw her that day at the Multnomah Hotel?

"A. No. I went there two times. No, I did not. It was not worth while. The nurse told me, 'She will never know you again. She is always like this.'

"Q. Did she tell you that in Mrs. Faling's presence?

"A. At the door.  As I was going out of the door. She said it under her breath."

Witness Charles Davis, waiter at the Multnomah Hotel, testified:

"A. Well, she refused to eat her dinner one day because I would not sit down and eat with her.  She said I had been away and she did not know why I would not sit down and eat.  I told her I had to eat downstairs because I had some business to attend to out in town and she wouldn't eat, and finally the nurse persuaded her to eat.  She really had to sit her down in the chair at the table, and started to serve her with soup, and she claimed there were snakes in the soup, and she wouldn't eat it, and the nurse had to pinch her, once—she really cried out, one time, and then she calmed down and went on to eat it.  At times it was snakes in the soup, and she said they were crawling.  And then the nurse would, one time, take it in the spoon, and hold it to her mouth, and she would spit it out, and she said, 'I don't care; you feed them to me and I will spit them out.'

"Q. How frequently would she do that?

"A. She did that quite often; she talked about snakes.  It was always something; either in the pudding, or in the soup, or in the coffee.  Always something she had to drink, there were snakes in it.

"Q. Would Miss Chattin be in the room where she could hear this?

"A. Miss Chattin was right with her all the time; never left.

"Q. How about calling people by their right names, or calling them by any name?

"A. She nearly always called Miss Chattin Lillie; only one day she told me—

"Q. (Interrupting.)  Who told you?

"A. Mrs. Faling (Continuing):  —told me I had to get the house straightened up because Lillie was coming back to-day, and told me to look after everything and see that the house looked nice because Lillie

was coming home to-day. I think that was the only day she didn't call the nurse Lillie. She always called Miss Chattin Lillie.

"Q. How did Miss Chattin treat her?

"A. Well, I don't know. She treated her, I guess, it seemed to me, like she treated her like she was her custodian.

"Q. How about taking seriously anything Mrs. Faling might say; did she do that?

"A. No. She never paid the slightest attention to the things Mrs. Faling would say.

"Q. How long did this condition of things continue?

"A. I never knew any change. It was the same thing every day, only sometimes worse. Her condition was always worse along toward evening. Sometimes she used to get violent, that is, as much as she was able. She was very weak and nervous and tottering when we would go to walk. Sometimes she would get up and imagine she was playing tag, or something, and start to run, and would fall, and many times I have caught her myself. Of course, Miss Chattin was always right there, too, at the same time.

"Q. Do you know whether or not it was ever necessary to restrain her by keeping her in bed, or anything of that kind?

"A. I don't actually know, only what Miss Chattin told me she had to do.

"Q. Go ahead, if Miss Chattin told you.

"A. She told me she had to fasten her in bed sometimes to keep her quiet; that she insisted on going out; she wanted to go out some place. She always kept the door locked. * *

"Q. How about the people around there, or in the halls; what did Mrs. Faling say about that?

"A. About the people in the hall?

"Q. Yes.

"A. She always imagined there was somebody out there when there was nobody out there at all.

"Q. How did she imagine that?

"A. Because, sometimes, she asked me to open the door and let those people in; that they kept knocking

and clamoring at the door. She said, 'Open the door and let them in.'

"Q. Would there be anyone there?

"A. There would not be anyone there. Sometimes I used to go to the door to show her there was no one there, and Miss Chattin would tell me, 'Don't pay any attention to her.'"

The witness Nellie Hopkins, who was a chambermaid at the Multnomah Hotel, testified:

"Q. Did Miss Chattin sleep there; is that your impression?

"A. Yes; she slept in the adjoining room to Mrs. Faling. She told me she would have to go in and help the night nurse when she got so bad; that they were afraid she would disturb the guests; and Miss Chattin told me that she would go in and help the night nurse when Mrs. Faling got worse. She slept in the adjoining room, and only a door between her bed and Mrs. Faling's. * *

"A. Yes, I talked to Miss Chattin about it. Lillian —I asked her who Lillian was, so I would know what to say to her, and Miss Chattin said—I said, 'Miss Chattin, shall I answer her, or just go about my work, and she said, 'Answer her and talk with her as best you can.' Mrs. Faling insisted on it, sometimes, I should answer her, and I didn't know what to say, and I asked Miss Chattin who Lillian was, and Miss Chattin told me Lillian was a daughter. * *

"A. When she would get out of that door she would start down the hall just like a little child, if she got out. She would be just like she saw an object, and ran quick. She got out of the door and ran down the hall—she got out of the door, but she did not get far once that I saw her. She did not get far until the nurse got her.

"Q. What nurse was that?

"A. Miss Chattin. * *

"A. She had two new dresses made, Miss Chattin said, and they put the first one on when I was up there in the room, the first morning I took care of it.

105 Or.—27

"Q. What happened about that?

"A. Mrs. Faling went to feeling all over it, and she put her hand on the shoulder, and Miss Chattin said, 'Now I expect I will have a time this morning with her. I am going to put a new dress on her,' and she started to feeling of it, and she went to complaining about the shoulder, and Miss Chattin told her that was a patch up there, and she felt some place else, and she said, 'I just mended your dress, and it is patched. Don't bother about it,' and she pacified her that way, and the new dress went all right. She didn't recognize her new dress, either. * *

"Q. Did you ever know about Mrs. Faling having Miss Chattin make deposits in the bank?

"A. Yes; she would have her make some some mornings. When she would lay down she would say, 'Now, you go to the bank and put five hundred dollars away, and Miss Chattin would go into the other room and come in and tell her that she had deposited it. One morning she had her go and put ten thousand dollars in the bank for her, and she came back and told her she had. She always seemed pleased when Miss Chattin told her that she had deposited the money for her. When I first went there to take care of the room, she got up off the bed and would go to a little box that she had on the dresser, and she said her jewelry was gone. And the next morning she said she had two dollars and something in there, and somebody had taken it. I asked the nurse if she was really missing money, because I felt kind of funny. She acted cross about, and Miss Chattin told me not to pay no attention; that her jewelry was locked up in some safety vault, I think, some place; and they never let Mrs. Faling handle any money, and she was not missing any. That was just her way.

"Q. Miss Chattin told you that?

"A. Yes, and not to pay any attention to her when she accused anybody of taking money.

"Q. When Mrs. Faling would call Miss Chattin to deposit money, did she actually give her money to deposit?

"A. No; she did not go near the bed, you know.

"Q. How would she say it?

"A. Well, Mrs. Faling would tell her to go down to the bank now and put five hundred dollars in the bank; and these two times I remember the amount of it. There were other times that she did the same, but I remember the five hundred dollars and the ten thousand dollars; and I spoke to the nurse and I said, 'She is getting prosperous,' when she was to put the ten thousand dollars in the bank. She would just tell her to go and put that money in the bank. She did not hand her anything.

"Q. Would Miss Chattin put on her coat or anything?

"A. Oh, no. She had just—would just go out in the hall, and come back to the bathroom, and tell her the money was in the bank; and it would be all right. * *

"A. Miss Chattin was always good to her. She never asked Mrs. Faling anything. They went ahead and took care of her just like a little child. She was just like a child; she combed her hair; and gave her her tooth brush. Miss Chattin gave her a drink— sometimes Mrs. Faling would get over there, but Miss Chattin would go then and give her a drink, just like a child."

Almira Whitney, who for many years conducted the Nurses' Central Register from which nurses are called and sent, testified as follows:

"Q. Did you receive a request for a nurse, to which you sent Miss Chattin?

"A. I did.

"Q. Was that to care for Mrs. Faling?

"A. I did not know when the call came in who it was to care for. It was to care for a patient at the Multnomah Hotel.

"Q. Did you at that time tell Miss Chattin this, or this in substance, that there was an insane patient at the Multnomah Hotel and they desired a strong, healthy nurse to care for her, and that she should go

down there, but should not wear any uniform, and the patient was in such condition that she might take a dislike to her, or something, and her stay would perhaps be just a short time? Was that, or that in substance, stated to Miss Chattin when you sent her down there?

"A. That was just about what the request was. This woman asked for a nurse for—I call it a mental case. I don't remember just what words she used, but mental case is all right. That was my understanding, that it was some sort of deranged mind. We did not go into that. It wasn't necessary. She wanted a strong nurse and a nurse without a uniform because the patient might take exception to a uniform and tell the nurse if she took exception to her and didn't want her to remain not to be hurt about it. That was the sum and substance. I said, 'Who are you, and who is talking?'

"Q. (Interrupting.) I don't care about the conversation. But was that repeated by you to Miss Chattin?

"A. Yes.

"Q. So Miss Chattin knew from you that she was going to take care of a mental case?

"A. She certainly did.

"Q. Was the word 'insane' used in that statement?

"A. (Interrupting.) I prefer to leave it as I stated, a mental case. Over a period of that many years I don't recall exactly what words she used, and she intended me to understand the woman's mind was not all right.

"Q. Did you give that information to Miss Chattin?

"A. I repeated to Miss Chattin at that time as near as I possibly could what the woman said, because it wasn't a period of more than three minutes. She happened to be in her room when I called her. When the call came in I called her downstairs and told her. * *

"Q. Did she, after this will was published, did she commence to repeat long conversations that she

claimed to have had with Mrs. Faling and did you jump her about it and say, 'Here, Miss Chattin, you never told me anything like that before the will was read.'

"A. Something like that."

Miss Mary Campbell, a nurse employed to care for Mrs. Faling for two weeks during September of 1915, testified:

"Q. Who employed you to take care of Mrs. Faling at that time?

"A. Miss Chattin. * *

"Q. Now, when you first met Mrs. Faling, do you recall what she said to you, the first time you saw her or met her?

"A. I think one of the first things she said to me, she asked me if I lived in the same home where she had known me.

"Q. Had you ever known her or been acquainted with her before?

"A. No, sir.

"Q. Did she talk to you in regard to her family?

"A. She asked me where my two boys were.

"Q. Were you married?

"A. No.   I have never been married."

Herman Whiteman, head waiter at the Multnomah Hotel from 1913 to 1916, testified:

"A. Well I knocked on the door and the nurse let me in and I went up and put the lunch on the table and Mrs. Faling said to .us, 'Here, fix the table, get everything ready, there is going to be a wedding and you have got nothing ready.'

"Q. Did she say anything about getting her own things ready?

"A. (Continued.)   And she told the nurse to go into the next room, the next apartment, and get some things fixed up that she would have to wear for this occasion.

"Q. Was there any wedding going on in the hotel at any time that day?

"A. No, sir, not a thing, and there hadn't been one for several months. * *

"Q. Did Mrs. Faling call Miss Chattin 'Lilly'?

"A. Yes, all the time.

"Q. What nurse was it, at the time she was talking about this wedding?

"A. Miss Chattin.

"Q. What did Miss Chattin say to Mrs. Faling, when she was talking about there going to be a wedding and to get the things ready?

"A. Just told her to get ready, get ready, get everything ready, Miss Chattin had full charge of Mrs. Faling just the same, as you would have charge of a child, that is the way it was, had absolute charge of her.

"Q. Do you mean by that, that is the way Miss Chattin treated her, just as though she was a child?

"A. Couldn't treat her otherwise because she didn't act any different. * *

"A. Well, they were walking in the hall, it is a very long hall, and the nurse had her arm around her leading her along you know, walking beside of her and telling her, and walking with her and she told the nurse to turn her loose, that she knew where she was, that she was on Washington Street. * *

"Q. Well, tell us just what her words were as near as you can.

"A. She said,—the nurse had hold of her arms and she was pushing the nurse like you know, and said, 'Turn me loose, I can walk by myself, I know where I am at, I am on Washington Street.' * *

"A. I started to talk to her once and she said a lot of crazy things and I saw it was useless and I didn't talk to her any more after that.

"Q. Were you able to carry on any sensible conversation with Mrs. Faling at any time you were there?

"A. No, sir, I was not, I did not carry on any conversation with her.

"Q. Did you ever hear her carry on any sensible conversation with Miss Chattin at any time you were there?

"A. No, she was radical all the time.

"Q. What do you mean by that?

"A. Never talked anything sensible.

"Q. Now at any time, did you hear or have you heard Mrs. Faling cry out or scream, when you were there?

"A. Yes, I have known her, I have heard her cry two or three times, but what she was crying about I don't know; sometimes crying and her hands were going that way [indicating] and the nurse would get a hold of her and catch her by the arms or shoulder and talk to her and take her into the next room and quiet her.

"Q. What would the nurse say to her?

"A. Tell her to be quiet and handling her just like she was a child and was nice to her. * *

"A. I was up in the room and she was standing pretty near the door, she walked over to the window and was looking down from the window and she walked past that window, the window was about half hoisted and she acted like she was going to go out through the window and I got hold of her arms and said,—

"Court (Interrupting): Speak up louder, I can't hear you.

"A. (Continued.) I got her by the arms, just as she was going out the window and I said to the nurse, 'You had better look out for Mrs. Faling, if you don't she might do something, she might jump out the window,' and the nurse was in the other room and she came in and got her by the arms, but I know if I hadn't got her by the arms from the balance she had she would have gone out of the window.

"Q. Now during all of these times you saw Mrs. Faling, from the time she came there up to the time she left, including August nineteen hundred and fifteen, what opinion did you form or have in your mind, or make in your mind as to whether she was sane or insane?

"A. My opinion she was insane.

"Q. From your observation of her and the calls you made upon her and the way she appeared,—in your opinion did Mrs. Faling know she was in the Multnomah Hotel?

"A. No, sir."

Mrs. Stella May Carothers of Shedd, Oregon, an old acquaintance of Mrs. Faling, testified thus:

"Q. I will ask you whether you saw Mrs. Faling at the Multnomah Hotel?

"A. I did.

"Q. At what time?

"A. Well, it was some time in the summer of 1915.

"Q. Can you fix the month, please?

"A. Well, I don't know whether I can exactly or not. It was either July or August.

"Q. How do you fix that?

"A. Because I was there on a visit at that time.

"Q. What was Mrs. Faling's condition at that time?

"A. Well, it was very bad.

"Q. Did you have a conversation about her condition with the nurse, in Mrs. Faling's presence?

"A. The nurse asked me if what she said to me was anything straight, and I told her no; and she said she did not know anything, scarcely had not, for some time.

"Q. Was Mrs. Faling there at the time?

"A. Yes, sir.

"Q. Was she where she co'ld have heard that if she had been in her right mind?

"A. Yes; she was laying on the couch, right beside me.

"Q. Did the nurse say it in a quiet way, or try to keep it away from her?

"A. No.

"Q. Was Mrs. Faling when you were there, talking about different animals?

"A. Something imaginary, on the wall.

"Q. What did she say about something on the wall?

"A. Spiders, for one thing I remember. I don't know just exactly. I did not pay much attention to what she saw.

"Q. How much of the time was Mrs. Faling talking or saying something?

"A. But very little. When I first went in she talked to me a little while and then she went over to the couch.

"Q. Could she talk about anything sensible; carry on a conversation?

"A. No; not a word.

"Q. Did you ever see her after that?

"A. I never saw her after that, no."

This witness stated that she saw Mrs. Faling two or three times in 1911; that she talked all right; and that she first noticed a weakness of mind in 1913.

Fred H. Naltner testified to the effect that C. Lewis Mead said Mrs. Faling did not want to leave Carl Schieck anything in the will but he had her put him in for $3,000. This witness was convicted of embezzlement in 1915.

Thomas S. Burley, shipmaster, testified that he and his wife lived at the Multnomah Hotel while Mrs. Faling was there and had rooms across the hall from hers. He stated the following:

"Q. Do you recall that you saw Mrs. Faling shortly after she came into the hotel?

"A. Yes, the first time, I couldn't say exactly, she had been there maybe a couple of days, not longer than that; I happened to come home one afternoon about 5 o'clock and the old lady was kicking up an awful fuss in there and not knowing who it was, I went in to see, to find out, and to see if I could be of any assistance at all.

"Q. What was she doing at that time?

"A. What was she doing,—she was wrestling around with the nurse if I recall rightly.

"Q. How was she acting, what was she doing?

"A. Well, just wrestling around with the nurse.

"Q. Do you recall whether she was screaming or not?

"A. Yes, she screamed at the top of her voice, that was what attracted my attention.

"Q. Who was this nurse you speak about?

"A. I just can't recall her name, if I heard it I could tell you.

"Q. Was it the day nurse?

"A. Yes, sir.

"Q. Miss Chattin?

"A. That is the name.

"Q. Did Miss Chattin at that time tell you anything about Mrs. Faling?

"A. Yes, she told me at that time not to pay any attention to the old lady because she was crazy. * *

"Q. During that time how often did you see Mrs. Faling?

"A. Well, very nearly every day, when I was in Portland, of course I might have been out away from Portland, but when I was in Portland I generally saw her daily and sometimes I was in her rooms.

"Q. You saw her in her own rooms?

"A. Yes, quite often I would see her there, I would see the old lady or come across her stumbling or running about the hallway.

"Q. What did you observe about her in the hall, what was she doing?

"A. Well, there were a great many times she was lying flat on the floor, wrestling with the nurse, refusing to allow the nurse to carry or lead her, or do anything with her, and a great many times refusing to go into her apartments, that is when the old lady was on one of her tantrums.

"Q. Did you ever carry her in yourself?

"A. Yes, a great many times.

"Q. How did Mrs. Faling address your wife?

"A. Well, mostly called my wife 'Lilly.'

"Q. Was this in your presence?

"A. Yes, she called her 'Lilly'. * *

"Q. During that time was she speaking about Lilly being out and not coming in?

"A. Yes, feeling worried while Lilly was not coming home or was not at home.

"Q. At that time this nurse explained to you who Mrs. Faling was talking about?

"A. Yes, of course that is only hearsay, what she told me about this Lilly.

"Q. At the time the nurse told you that was Mrs. Faling there where she heard it?

"A. Yes, sir.

"Q. Did you often call into the apartment there, where Mrs. Faling was?

"A. Very often.

"Q. What attention did Miss Chattin give or pay to what Mrs. Faling would say or do?

"A. Nothing, except of course when Mrs. Faling would get rough, anything like that,—Miss Chattin was very kind to her and allowed her to have her own way.

"Q. What do you mean by 'getting rough,' what did she do at these times, that you were there?

"A. Well, rolling on the floor and such antics as that.

"Q. Do you recall her running around the room?

"A. Yes, very often, through the rooms. * *

"Q. How did she [Miss Chattin] speak to Mrs. Faling, how did she refer to Mrs. Faling as to her condition, her mental condition?

"A. Well, she referred to her as a crazy woman.

"Q. Now at times when you called there would you ask, or did you ask Miss Chattin how Mrs. Faling was?

"A. Yes, sir.

"Q. And what response did she give you or make you at those times?

"A. Invariably her answer would be, 'Just as crazy as ever.' * *

"Q. Now during that period, from November, 1914, until January, 1916.

"A. (Interrupting.)   I am not testifying as to the exact date.

"Q. No, but you may assume that is the correct period, that is during the period that Mrs. Faling was there at the Multnomah Hotel, and during the time that you saw her, now during that time, or nearly the whole period you saw her and the times you were in her apartment or she was in yours, or during all the times that you saw her in the apartments or in the hall, were you able to carry on an intelligent conversation with her?

"A. No.

"Q. Were you ever able to carry on a connected conversation with her or she able to carry on a connected conversation with you?

"A. No, I am sorry to say that the old lady never did that.

"Q. In your own opinion from your knowledge of her, during that time did Mrs. Faling know and understand her surroundings, and what she was about, and the relation of herself and others from what you saw of her?

"A. I don't think the old lady realized that she was living in a hotel and I don't think she ever realized who was around her, she addressed me as 'Carl' at times, and Miss Chattin explained to me that was her son-in-law 'Carl' and at times she addressed me as 'Mr. Strong' and the nurse explained to me who Mr. Strong was.

"Q. How often did she address you as 'Mr. Strong'?

"A. A great many times, I couldn't begin to tell you.

"Q. In your opinion, in 1915, during the year 1915, and in August, 1915, was Mrs. Faling a sane person or an insane person?

"A. No, I don't think at any time during that time Mrs. Faling was ever rational; of course, sometimes she was really a maniac.

"Q. In your opinion in August, 1915, or in 1915 at any time, was Mrs. Faling competent to make a will?

"A. Well, I don't know about August, 1915.

"Q. Why I say August, 1915, in August, 1915, that is because in this case the will in question was ex-

ecuted in August, 1915, and therefore I am putting that into the question, that particular time.

"A. Well, I wouldn't be specific in any particular month, I would not specify in August, 1915, but I will say that I don't think during any of the time I was acquainted with Mrs. Faling that she was ever able to make a will or know what she was doing.

"Q. You were acquainted with her and saw her during all of 1915?

"A. Yes, sir.

"Q. Now whether she was in your judgment at any time in 1915, in your opinion, competent to make or execute a will?

"A. No."

Mrs. Catherine Becker who is named as a beneficiary in the 1915 will, in her deposition taken in California on behalf of contestants testified:

"Q. Do you recall of her coming out to your house about in October, 1914?

"A. I do.

"Q. Who were the nurses at that time?

"A. Miss Stein and myself.

"Q. And did Miss Stein accompany her to your house,—was she with Mrs. Faling when Mrs. Faling was there at your house?

"A. Yes, she came with her. * *

"Q. Do you recall anything that Mrs. Faling said in regard to the rooms at the Sargent, that is as to whether or not she was being incarcerated there?

"A. Yes, sir, she said she was, she would try to get out and the room door was locked so that she couldn't get out and that there was poison in her food, she couldn't get a good meal.

"Q. How long did she have these ideas?

"A. Well, it must have been three or four days before she was taken away.

"Q. Do you recall if she was taken from her room, her old room to other rooms across the hall?

"A. Yes, sir, she was.

"Q. While she was in the new room, what did she say about that,—what did she say?

"A. Well, she seemed to be satisfied after being moved across the hall, for a little while, after she was out of her old room, the new rooms seemed to satisfy her.

"Q. Well, what did she say was in her own rooms, or what was the matter with them?

"A. Well, she imagined people were hidden behind the door and trying to get in the door, she imagined they were trying to come in after her, and wanted the doors locked so that they could not come in.

"Q. How often did she speak of the fact that they were trying to get in there and—

"Mr. Logan (Interrupting): When was this?

'A. That was in 1914, or it was either in October or the latter part of September, 1914.

"Q. I intended to ask the question in the first place, whether this was just before she went to Sellwood?

"A. Yes, this happened just before she went to Sellwood.

"Q. Did you hear her speak of her daughter Lilly, while there at the Sargent?

"A. Yes, sir.

"Q. What did she say in regard to her?

"A. Well, she imagined Lilly was incarcerated with her at the same time and that they were both there in the room; she imagined that.

"Q. Do you recall of her inquiring of you at the time as to whether Lilly was not released?

"A. Yes, sir."

On cross-examination this witness stated:

"Q. So if I get your position correctly, Mrs. Faling after she came back from Irvington, she had mental ability sufficient to make a will until September, 1914?

"A. I think there were times when she could.

"Q. At that time she became physically ill?

"A. Yes.

"Q. When and by reason of a nervous breakdown, or a physical breakdown, she became seriously ill and was unable to do that?

"A. Yes.

"Q. And you left before she had fully recovered?

"A. I did."

This witness said that Mr. Mead called upon her in San Francisco, she thought during the fall of 1915, and on cross-examination she testified:

"Q. Did he say a will had been made?

"A. Well, he told me the provisions,—as near as I can remember, he said Mrs. Faling had made or was going to make her will, he said, 'I asked her what she wanted to say in the will and she wanted to leave some of the property to some of the charitable institutions, and wanted to leave some to her old friends, but didn't know whether to leave Kate anything and I told her it would be a good idea,' he said, 'I think if you are going to leave some of your old friends something, you should leave Kate something,' and she said, 'If you think so, I guess it is all right, yes.'

"Q. That was the whole conversation?

"A. Yes."

Lot Q. Swetland, a witness for contestants, who is named in the codicil dated June 6, 1914, to the 1911 will, and who leased of Mrs. Faling the lot on which the Swetland building was erected by him, Mrs. Faling advancing about $50,000 for that purpose, and who had many business transactions with Mrs. Faling for several years, testified that the last dealings he had with Mrs. Faling personally were in February, 1914. After that he settled the rent with Mr. Strong. He saw her later in that year at Sellwood and at the Multnomah Hotel. He also testified:

"Q. I wish you would please tell the Court the appearance and what happened, detail the circumstance on your visit at Sellwood, as near as you may, as near as you are able.

"A. It was in nineteen hundred and fourteen, but I couldn't give the date exactly; I just returned—I just returned from a trip in the east, and learned that

Mrs. Faling had been removed to Sellwood, and on Monday immediately on my return, I went out to call on her and took a basket of fruit with me and I found Mrs. Becker—Mrs. Faling was at Mrs. Becker's residence; Mrs. Becker admitted me and took my umbrella and the fruit and I told her I wanted to see Mrs. Faling and Mrs. Becker * * took me into the room where Mrs. Faling was, she was in bed, Mrs. Faling was sitting up in bed; she didn't recognize me and Mrs. Becker asked her if she didn't know me. 'Oh, yes,' she said, 'I know you,' and then began talking in a rambling manner and then I asked her how she was and she said she was not feeling well; she said that the ceiling had fell down on her the night before and the rats up there were raising a terrible rumpus.

"Q. Were you able to carry on a conversation with her of any kind?

"A. Absolutely no conversation. I just remained a few minutes and then left.

"Q. How long did you attempt to talk with her?

"A. Oh, it was not over five minutes; there was no conversation; it had no point at all. * *

"Q. I will ask you whether or not on that visit to Sellwood, in your opinion, Mrs. Faling was in such a mental condition to know and understand a business transaction?

"A. No, she could not.

"Q. Do you think she was in such a mental condition as to know her relation to people, her friends, for instance, and—

"A. (Interrupting.) No, sir, I don't think so.

"Q. (Continued.) Was she of sufficient mental condition, was she in a sufficient mental condition to know about her property and the location of it and the value of it and such as that?

"A. No, sir.

"Q. Then did you see her again after that?

"A. I think only once.

"Q. And where was that?

"A. At the Multnomah Hotel.

"Q. And are you able to recollect about what time, or when that was?

"A. I think in the fall of the year.

"Q. I wish you would please detail what occurred at that time, if you will.

"A. Mrs. Swetland accompanied me to the Multnomah Hotel and we was directed up to the room where Mrs. Faling was and Miss—the nurse, the tall lady, I forget her name—

"Mr. Burnett (Interrupting): Miss Chattin?

"A. Miss Chattin, yes, she ushered us in and Mrs. Faling didn't recognize us and Miss Chattin asked her if she knew who I was but Mrs. Faling didn't know me and she said, Miss Chattin said 'This is Mr. Swetland and Mrs. Swetland' and she said 'Why Mr. Swetland is in California' and then she looked at my wife; my wife had known her ever since she was a little child and then Mrs. Faling said something incoherently; I don't just recall what it was but the nurse said 'You must not pay any attention to what she says, she don't know what she is talking about.'"

. On cross-examination this witness testified:

"Q. Just a minute, in that conversation did you not say 'That I was a little peeved' meaning yourself' at her not coming'?

"A. No. I never made that statement because I knew absolutely then—I knew that Mrs. Faling never had had anything to do about it; I knew Miss Chattin hunted up the quarters, selected the quarters, and Mr. Mead—Miss Chattin selected the quarters and after they were selected, Mr. Strong informed me of it, and I said 'Why didn't you suggest that Mrs. Faling come to the Perkins'; she had before that expressed a desire to go there, because it was across the street from her building and she could look at it, it was near her own property there and I asked about it and he says 'You don't want Mrs. Faling in the building' and I says 'Why,' and he says 'Because she gets cross at nights and makes a noise and it would annoy the guests,' and I knew of this before when she first went

105 Or.—28

to the Multnomah and afterwards when she was moved to the Imperial I went to Mr. Strong and I told Mr. Strong I thought I was being treated unfair and that they knew the condition we were in and that we would like to have Mrs. Faling in the building and he said Mrs. Faling had nothing to do with it.''

During the fall of 1915, Mr. Swetland made an application to Mr. Strong for a reduction of· rent for the Swetland building, and on November 26, 1915, at the suggestion of Mr. Strong he reduced the matter to writing in a letter to Mrs. X. J. Faling care Mr. Thomas N. Strong, Labbe Building, City. Regarding this transaction Mr. Swetland testified:

''Q. What if anything occurred between you and Mr. Strong concerning the writing of this letter, Contestants Exhibit F.3.

''A. Mr. Strong told me that he—I was down at his office complaining about the conditions and he told me to put the matter into writing and he would bring it up before Mrs. Faling and get action on it later.

''Q. Did he, during all this time, ask you or suggest that you go with him and that you take it up with Mrs. Faling?

''A. No, sir.

''Q. Or did he suggest that you and he take it up with Mrs. Faling?        :

''A. No, sir.

''Q. Did you suggest that you talk with Mrs. Faling about it yourself?

''A. Yes, sir.

''Q. And what would his answer be to that?

''A. Sometimes it would be one way or another, that she was not very well or she was unable to talk business or it would irritate her or something like that. * *

''Q. Did he ever suggest to you that you try to talk it over with Mrs. Faling?

''A. No, sir.

''Q. What did he say about his taking it up with Mrs. Faling?

"A. He said he would take it up with her.

"Q. On what occasion or how, is what I mean.

"A. When he had an opportunity, when the proper opportunity arose or something like that.

"Q. What did he say about that—, about the proper opportunity?

"A. When she was in a condition to talk business."

On January 21, 1916, Mr. Strong for Mrs. Faling wrote a letter to the Swetland Building Company making some temporary concessions. This witness further testified:

"Q. I will ask you whether or not at the time that you last saw Mrs. Faling in the fall of nineteen hundred and fifteen, this letter was written in January nineteen hundred and sixteen, if Mrs. Faling could of understood this letter?

"A. In that fall, not then, no.

"Q. That was the time you saw her at the Multnomah Hotel?

"A. She couldn't when I saw her then.

"Q. Could she have kept in her mind these figures and could have known their relation to each other?

"A. No, sir.

"Q. Do you know whether or not Mr. Strong ever took this up with Mrs. Faling or not?

"A. I do not know."

Miss Helen M. McDonald, a trained nurse, also testified that she attended Mrs. Faling from November 7, 1914, for a period of seventeen months, or until June, 1916. Miss Chattin instructed her to take care of Mrs. Faling "just like a child, the way she was taking care of her." Miss McDonald was night nurse most of the time. She was day nurse during July and two weeks in September, 1915, in Miss Chattin's absence. She stated:

"A. She informed me that at times when Mrs. Faling was unruly and screamed, was screaming or yelling to hold my hand over her mouth, and she was hard

to put to bed; sometimes she would scream at bed-time and she told me to hold my hand over her mouth and to put her to bed about the usual time which is about 8 o'clock, that is the time she went to bed.

"Q. Did Miss Chattin tell you why to hold your hand over her mouth, did she give any reason, or what was her reason for that?

"A. Yes, she said so as not to annoy the guests, that Mrs. Faling was insane and that it would annoy the guests and the hotel might make us leave and we would have to take her to a private asylum and she preferred to live in the hotel, she didn't want to leave and to hold my hand over her mouth so she couldn't holler and disturb the other guests or make a noise. * *

"Q. Did you form an opinion during that period as to her sanity or insanity?

"A. Did I form an opinion?

"Q. Yes, from your observation of her, seeing what she did, and how she talked and how she acted.

"A. Why, I don't know as though you would call it forming an opinion; I realized she was in an un-balanced state.

"Q. Was she a sane person or an insane person?

"A. Insane person; mentally deranged.

"Q. Was she at any time during that period of sound mind?

"A. No, not to my knowledge.

"Q. Was she of sound and disposing mind and memory?

"A. No, sir.

"Q. Was there any time during that period of your employment there when she appeared or acted as a sane or normal person?

"A. No, at no time.

"Q. Was she at any time competent, mentally competent to make or execute a will?

"A. No, she was not; she could at no time carry on a conversation of any kind.

"Q. Did she understand business or business affairs.

"A. She did not.

"Q. Or her properties (continued).

"A. She did not.

"Q. (Continued). Or about her property rights?

"A. No, I saw no indication of anything of the kind. * *

"Q. How did she go to bed at night?

"A. Sometimes she didn't want to go to bed and she would commence a tirade, fight, scratch, bite and kick.

"Q. Would she bite or try to bite you?

"A. Yes, if I gave her a chance she would.

"Q. Did she scratch you?

"A. Yes, scratched the skin off of my face.

"Q. Did she undress herself or did you undress her?

"A. I undressed her absolutely.

"Q. What about putting her to bed?

"A. Well, I always tried to get her to go to bed; that was pretty hard to do, and I would suggest that it was time to go to bed; very often she didn't want to go to bed, and it was a pretty hard job to get her to go. * *

"Q. While Mrs. Faling was at the Multnomah Hotel there, at the time you were there, did she realize that she was at the hotel, at that hotel?

"A. At no time to my knowledge did she ever realize she was there. * *

"Q. Do you recall a time,—do you recall a polka dot dress that she wore?

"A. Yes, polka dot dress that she wore and it had large dots in it, as big as dimes, and she would pick at these, picking off dimes, and half dollars and dollars, very often when I was around and I didn't like her to wear it on that account.

"Q. Did she speak of those dots as money?

"A. Yes, just as picking off dimes, half dollars and dollars, she did.

"Q. Now in the morning, do you recall anything that she did in the morning, when she got up from bed in the morning?

"A. Well, in the summer-time daylight was early and she would get up early and she would be chasing around the room without any gown on, without any clothes, she would take off her gown and be chasing monkeys out of the closets.

"Q. Do you mean that she was running around without any clothes, that she was nude?

"A. Yes, without any clothes on whatever.

"Q. How often would she do that?

"A. Some occasions three or four mornings in succession and then again maybe not for a week or more. * *

"Q. In July, 1915, when you were there or at any time, do you recall that Mrs. Faling told you or said anything about her husband waiting for her, being there?

"A. Yes.

"Q. Will you tell that occurrence?

"A. That was one evening shortly about 7 o'clock and she wanted to get out and she said that her husband was in front of the hotel waiting for her, and she couldn't go and she wanted the nurse to go. I had the doors locked, so she couldn't get out and she said, 'Oh, you girls go, you girls go down, he will be angry if I don't come and you go and tell him.'"

Mrs. Geraldine C. Ridley, also testified that she met Mrs. Faling in December, 1914; that she was her nurse in June, 1915, and saw her two or three times a week in the meantime; and that Mrs. Faling had many delusions during that time. She described Mrs. Faling's condition thus:

"A. Well, she was a short woman, and she had a trembling of the head and hands, and you could tell of her mental condition by her actions, and from what she said and she never knew people around her, didn't know the nurse and things like that."

She said Mrs. Faling mentioned rats in the room "maybe two or three times a week or oftener, * * that was common talk rats, cows and snakes and

babies''; that she was nurse there in June and July, 1915, and then went to Alaska; that at the Multnomah Mrs. Faling occasionally saw her husband on the corner and said, ''I wish you would tell him to come in please, I want to see him''; that Mrs. Faling struck her in the face and knocked her glasses off; that in July, 1915, she was getting Mrs. Faling's breakfast and tried to persuade her to eat and Mrs. Faling said, ''You don't need to eat if you have wild peacocks in your forest''; and that she did not know what was going on about her in the same room in July, 1915. Mrs. Ridley testified:

''Q. Did she ever pass or make some observations, concerning one 'Charley Mead,' at any time, or different times?

''A. Yes, one time I asked, after he had been to see her 'Who was that man?' and she looked up at me and in a mumbling way said 'I am glad I am not in Charley Mead's clutches.' ''

She would go through the motion of paying for breakfast, pay twenty-five cents for a $1.25 or $1.50 meal. At the Multnomah Hotel she was going to have a colored boy undress her and put her to bed. Mrs. Faling said her food was poisoned; cried ''Chief of Police Crowley,'' ''Keeping me in jail,'' etc. After she returned from Alaska in March Miss Chattin told her that Mrs. Faling had made a will and that she (Miss Chattin) had got $3,000 but not to mention it, and that she inquired how she could do that, ''that woman could not make a will,'' and Miss Chattin said, ''I got the pen and ink and we held her hand and she signed it.''

Miss Luellan Waln, a witness for contestants, testified that she was a nurse by occupation and in June or July, 1915, she went to visit Mrs. Ridley who was then nurse for Mrs. Faling; that Mrs. Faling

"was lying on the lounge and she called me some name, I didn't know the name; it was not my name; she asked where we had been riding and asked me about my husband, how he was, and how my children were and talked of picking flowers. * *

"Q. Had you and she been riding?

"A. Why no.

"Q. Had she ever seen you before?

"A. No."

She testified she saw Mrs. Faling probably ten or twelve times in June and July, 1915, mostly July.

"Q. During that month, did you see her; I will ask you to please tell his Honor about her conduct and the things she said, please?

"A. Well she saw people, 'Who is that man,' 'Where is he' 'Where is the sheriff,' and one time she was going to pick up a chair, she tried to get up, and tried to move, get up, but couldn't said there was a cow holding her down, that there was a cow on her. * * She was not sane, at any time."

Mrs. Carrie Jensen testified that when she would call on Mrs. Faling at the Multnomah Hotel Miss Stein would tell Mrs. Faling who she was.

"A. She said, 'This is Carrie,' and she would say, 'This is Carrie' and after mentioning it twice, she looked like she would remember me, but she then soon forgot me again.

"Q. Now did you talk with Mrs. Faling at that time or undertake to have any conversation with her?

"A. No, sir.

"Q. From what you saw and what you heard, what did her mental condition appear to be at that time?

"A. Very poor.

"Q. Did Mrs. Faling appear to know her surroundings or who the people were that were in the room?

"A. No, sir."

Mrs. Frances Olive Jensen, as a witness for contestants, testified that she saw Mrs. Faling at the Multnomah Hotel in February, 1914.

"A. I walked up to her and I put my arm around her and I said, 'Mrs. Faling, don't you remember me?' And she said 'No; who are you; what do you come for?' And I tried to make her remember me. I said 'Don't you remember Mrs. Jensen?' She said 'No.'

"Q. Did you then see in her face any sign of recognition?

"A. Yes—no, not of recognition. Her face seemed to be a blank.

"Q. Do you recollect anything that occurred after that?

"A. Yes; she seemed to be strange; and all of a sudden she called me over to the front window, the front of the hotel, and she asked me to come over and look out through the window, and I walked over, and she said 'Now,' she says 'this is all of my building. I have built these flats or apartments, and I want to take you all through them and show them to you,' and I said 'Mrs. Faling,—I knew she could not go out, that she was not allowed out of the room, and I said 'I have been all through the building, and I think they are just lovely,' and that seemed to please her. She said 'This building is all mine, and if it pays,' she says, 'You see this vacant block, and I want to build it up just the same as this, if this building pays me.' And then she says 'Oh, catch them over there,' and I said 'Catch what?' and she said, 'There is a letter from Lillie in the window; get it quick,' and I ran over to the window as if I was going to catch something, and then I said 'It is not here; it is gone,' and she said 'Oh, the wind has taken it out.' "

Several other witnesses testified on behalf of contestants much to the same effect as to Mrs. Faling's mental condition at different times.

3. We have devoted considerable space in setting out a portion of the voluminous testimony, to show the trend thereof. Much time has been consumed in carefully reading all of the testimony. The burden of proving by a preponderance of the testimony the

testamentary capacity of Xarifa J. Faling, deceased, at the time of the execution of the will dated August 26, 1915, was upon the proponents: *In re Will of King,* 87 Or. 236 (170 Pac. 319); *In re Sturtevant's Estate,* 92 Or. 269 (178 Pac. 192, 180 Pac. 595). In this they have failed. We are satisfied that the testimony fairly shows by a great preponderance that at the time in question Mrs. Faling did not have sufficient mental capacity to execute a valid will.

4. There were no living relatives of Mrs. Faling who had any claims upon her bounty. She was perfectly free to dispose of her property in any manner that she willed, without considering any natural claims upon her. The rule in regard to testamentary capacity has been stated in numerous opinions of this court, quoted *In re Diggins' Estate,* 76 Or. 341, 345 (149 Pac. 73), as follows:

"If a testator at the time he executes his will understands the business in which he is engaged, and has a knowledge of his property, and how he wishes to dispose of it among those entitled to his bounty, he possesses sufficient testamentary capacity, notwithstanding his old age, sickness, debility of body or extreme distress: *Ames' Will,* 40 Or. 495, 504 (67 Pac. 737, 741); *Hubbard* v. *Hubbard,* 7 Or. 42; *Clark's Heirs* v. *Ellis,* 9 Or. 128; *Chrisman* v. *Chrisman,* 16 Or. 127 (18 Pac. 6); *Swank* v. *Swank,* 37 Or. 439 (61 Pac. 846); *Stevens* v. *Myers,* 62 Or. 372 (121 Pac. 434, 126 Pac. 29); *Wade* v. *Northup,* 70 Or. 569 (140 Pac. 451)."

See *In re Sturtevant's Estate,* 92 Or. 269, 281 (178 Pac. 192, 180 Pac. 595). The sum of all the authorities is tersely stated in *Darby* v. *Hindman,* 79 Or. 223 (153 Pac. 56), thus: "A sound and disposing mind or testamentary capacity implies that the testator fully understands what he is doing and how he is doing it."

The testimony indicates that in the fall of 1914, about the time that Mrs. Faling went to the Sellwood cottage, her physical and mental condition was serious and there was a marked change in her. After she was taken to the Multnomah Hotel, about November 1, of that year, it appears that she took but little interest in the conduct of her general affairs, and did not seem to appreciate or understand in regard to the arrangements for her personal care, the position or employment of her two nurses or the compensation paid them, or the cost of her food. We believe the testimony to the effect that she did not realize she was living in a hotel. Most of her friends ceased to call on account of her condition, and those who did visit her were rarely recognized. She was treated as a child by her nurses. Her mental condition in 1911, described by Dr. House and Dr. Stearns had grown much worse. Mrs. Faling had been a woman of strong mind and had led an active, energetic business life. Commencing in the conduct of a bookstore with her father and brother, and keeping a boarding-house on Fifth and Washington Streets, in the face of many family difficulties, by economical and shrewd business efforts she amassed a fortune. She was habitually self-reliant, and was inclined as a rule to keep her business to herself except for good reason or necessity. In legal matters she relied implicitly upon her attorney, yet at one time she had on deposit in the Ladd and Tilton Bank more than $100,000 of which for a long time she did not inform her attorney Mr. Strong. She had a checking account in another bank usually ranging from $25,000 to $35,000, from which she made loans and drew checks.

When Mrs. Faling was moved from Sellwood to the Multnomah Hotel, on arriving there, as stated by Mr.

Mead she remarked, "This is the place, is it?" Although she had seen Portland grow for years it would seem that she did not thoroughly understand where she was going. After that, as contrasted with her former habits of life, all her wants were looked after by others. Her meals were ordered for her and brought to her rooms. Her clothing was selected for her. Her immediate affairs were controlled by her nurses. Her expenses were paid for her under the power of attorney mentioned. One of her nurses was provided with money to pay little incidental expenses around the hotel. After Miss Chattin attended her she wrote Mrs. Faling's letters to her friends for her. Miss Chattin had trouble in ascertaining the addresses of Mrs. Faling's friends after Miss Stein died, yet it seems never to have occurred to Miss Chattin to inquire of Mrs. Faling in regard to such addresses. When it was necessary for Miss Chattin to strap Mrs. Faling to the chair to prevent her from getting up and walking, as there was danger of her falling, Miss Chattin did not think to tell her to remain sitting while Miss Chattin would necessarily leave the room for a moment. The conduct of affairs around Mrs. Faling's rooms was willed and shaped by her attendants. Mrs. Faling's former strong mind no longer guided the arrangements in her behalf; it was practically a blank. She often believed that Lilly, her deceased daughter, was alive and near her, and frequently imagined that her husband, whom she had shot to death, was across the street or gone to a near-by city. She would endeavor to rent rooms in the hotel as though it were her own. She apparently cared no more about her Swetland building than she did her imaginary flats across the court or street. She did not appear able to understand any business in which

she might engage or to know her property. She did not distinguish between money with which she had dealt so successfully, and spots on her clothing or on the rug. She could not carry on a connected conversation. At times she was violent. She never went out of the Multnomah Hotel until she was moved to the Imperial Hotel in January, 1916. All her business transactions were done under the watchful care of Mr. Strong who was really responsible therefor. From November, 1914, her acts under different conditions and at all times indicated complete mental imbecility. She never recovered.

5. In Schouler on Wills (5 ed.), Section 110, it is stated: "But where a state of habitual insanity is shown, continuous and chronic, the presumption gathers great force that any will which such a person may have executed is tainted or discolored by his insanity, and consequently cannot operate. And unquestionably the state of insanity once clearly developed in the patient, there is much reason to apprehend that the disorder may again recur, though disappearing for a season. If, then, notwithstanding any adverse presumption, it can be established that the party afflicted habitually by mental unsoundness was wholly cured when he made his will, or, much less than this, that the testamentary disposition took place while there was an intermission of the disorder, or, in other words, during a 'lucid interval,' the will should be upheld.

"There are English cases which thus sustain wills made during a lucid interval, subject to the unfavorable presumption against capacity which must first be overcome. American cases are found of the same tenor."

In Section 111 we read:

"But clear and satisfactory proof should be required that the person habitually insane made the will in question intelligently and freely, during a lucid

interval, where this and not a complete recovery is to be established. * * "

After May, 1911, when Mrs. Faling had her first serious mental trouble, until November, 1914, as shown by the testimony, there were many instances of her mentality shining out through the clouds until the malady became incurable and confirmed.

Where habitual insanity is once established it may be disproved at the moment of the execution of a will only by clear and convincing proof. This burden is on the proponents of the will: 1 Alexander on Wills, p. 456, § 338; 1 Schouler on Wills (5 ed.), *supra; Re Schmidt's Will,* 139 N. Y. Supp. 464, 477.

6. Whether Mrs. Faling was competent to execute a valid will on August 26, 1915, can best be determined by a comparison of herself at that time with herself in former years as she was known by those who had opportunities to observe and measure her mental qualifications. A marked change in a person's habits and thoughts is evidence of mental unsoundness. Insanity is indicated by proof of acts, declarations and conduct inconsistent with the character and previous habits of the person: *Knapp* v. *St. Louis Trust Co.,* 199 Mo. 640 (98 S. W. 70, 78). As stated in 1 Schouler on Wills (5 ed.), Section 86:

"Insanity * * is more readily concluded from the symptoms in a given case than defined on abstract principle. High legal and medical authority defines it as the prolonged departure, without adequate cause, from the states of feeling and modes of thinking usual to the individual in health.

"Insanity may involve bodily diseases, but the disease primary and predominant, where it exists, or the congenital defect, has its seat in the brain."

7. There is no particular degree of mental acumen to serve as a standard for testamentary capacity. The question for determination is whether Mrs. Faling was at the time she signed the purported will of August 26, 1915, and in the act, mentally capable or mentally incapable of executing a will. Each case must be decided upon its own facts and circumstances: 1 Schouler on Wills (5 ed.), § 88 et seq. See *Galt v. Provan,* 108 Iowa, 561 (79 N. W. 357, 360).

8. Under Section 727, Or. L., it is competent for a subscribing witness to a will, the validity of which is in question, to testify as to his opinion respecting the mental sanity of the person who signed the will. If the witnesses are intimate acquaintances of the testatrix they could properly express their opinion as to her sanity and give their reasons for it; but it is for the court to ultimately decide whether Mrs. Faling at the time had sufficient mental capacity to execute a will. See *In re Sturtevant's Estate,* 92 Or. 269, 283 (178 Pac. 192, 180 Pac. 595), where this is clearly pointed out by Mr. Justice BURNETT. In the case last mentioned, which is cited and relied upon by proponents, we notice the great difference in the care observed in the execution of the will of Sturtevant and the purported will of Mrs. Faling: See page 286 of that opinion. Sturtevant was at the time under guardianship. As a precautionary measure the attorney who drew the will called in a physician who thoroughly examined Sturtevant for about an hour and testified he was of sound mind. The testimony on behalf of proponents in the present case does not measure anywhere near to that for proponents in the case of Sturtevant's Will.

*In re Morrisey's Will,* 91 N. J. Eq. 480 (111 Atl. 26), the Supreme Court of New Jersey in discussing a similar situation said:

"Mr. McAdams, a reputable member of the bar, who drew the will and supervised the legal formalities of its execution, although satisfied from his own observation and intercourse with Mrs. Morrisey that she was not lacking in testamentary capacity, resisted her importunities to draw the will until fortified by the scientific determination of Dr. Prout that she was fit. His circumspection and precaution were not born of doubt, as insinuated, but were the promptings of a careful lawyer conscientiously serving his client, in whom, and in whose estate, he had no interest other than as counsel. Such safeguarding inspires confidence, not distrust, in the integrity of wills. Dr. Prout's interest in the case was strictly professional, and it impressed me as profoundly as it did counsel."

See *Hunter* v. *Battiest,* 79 Okl. 248 (192 Pac. 575); *People* v. *Gerold,* 265 Ill. 448, 477 (107 N. E. 165, 177, Ann. Cas. 1916A, 636, 648).

Mr. C. Lewis Mead prepared the will in question in the instant case. He was inexperienced in the matter, was not a lawyer, and states that he consulted none. All of the persons present when the will was signed were either named as beneficiaries in the document or were closely related to one of the beneficiaries. These persons and some others give their opinions that Mrs. Faling was capable of understanding the business in which she was engaged and was of sound mind, and in effect that she was capable of making a will at the time in question, and described her condition and conduct. The testimony of the various witnesses on both sides indicates different dates when Mrs. Faling became mentally incapable of disposing of her property by will.

9. Of course it is for the court to determine from the evidence as to the truthfulness of the data upon which the opinions of the witnesses are based. The facts and circumstances as to her mental state, as shown by the evidence, are as we view it what weigh the most in passing upon the main question. We may be aided, but not controlled, by the opinion of witnesses, especially expert witnesses: 1 Alexander on Wills, §§ 383, 384. For a long time Dr. Visetti was her only attending physician. He does not profess to be an expert in mental cases, does not well understand the English language and would not be expected to know whether Mrs. Faling's sayings were rational or otherwise. His testimony throws but little light on the case. The letters written by Mrs. Faling indicate that she was rational when she wrote them. She wrote none for about two years prior to August 26, 1915. Those written by Miss Chattin after November 1, 1914, do not bear the impress of having been dictated by Mrs. Faling. It was doubtless necessary on account of her trembling hand for someone to write for her, but that would not cause her to refrain from expressing her mind if she was able to do so.

10. Notwithstanding Mr. Mead's lack of experience, it is believed from the testimony of several disinterested witnesses that he was aware that Mrs. Faling was not then in a mental condition to stand the test of such an examination as made of Sturtevant or of any examination by a disinterested, fairly experienced layman. Mr. Mead is one of the two principal beneficiaries to a large amount in the purported will in question. He prepared the will, procured the presence of the attesting witnesses, and superintended its execution. His conduct must be viewed and scrutinized as that of an interested party. It is said that

"propriety and delicacy would infer that he should not conduct the transaction." In such a case the burden of proof is on the proponents to establish the testamentary act with greater particularity than would be required where the will is prepared by and executed in the presence of disinterested persons: 1 Alexander on Wills, § 398; 1 Schouler on Wills, § 245; 40 Cyc. 1084; *Coffin* v. *Coffin*, 23 N. Y. 9 (80 Am. Dec. 235); *Post* v. *Mason*, 91 N. Y. 539 (43 Am. Rep. 689); *Matter of Mondorf*, 110 N. Y. 450, 456 (18 N. E. 256); *In re Gedney's Will*, 142 N. Y. Supp. 157, 176.

11. It is observed that there is a radical change in the purported will of 1915, from the will of 1911 and other former wills as far as shown. The Patton Home was bequeathed $2,000 in the 1911 will and nothing in the 1915 will. The Oregon Humane Society was left $3,000 in the 1911 will and nothing in the 1915 will. It appears Mrs. Faling had for a long time taken a great interest in horses and other animals and had donated a fountain in aid of the Humane Society. Charles Jensen and wife and Theodore Jensen and wife, intimate friends of Mrs. Faling, were remembered in the 1911 will and omitted in the 1915 will. The same is true of the Grays and Warneckes, who had been friends of Mrs. Faling for many years. Mrs. Faling had no love for her reputed brother, Cornelius Barrett, and never when in her right mind indicated an intention of giving him any more than she was very unwillingly compelled to donate to him. This she did in the will of 1911; yet provided for $10,000 for him if alive in the later purported will, although she did not name him in that will. No good reason can be conceived why Carl Schieck, her former son-in-law, who had remarried and entirely dropped Mrs. Faling in 1906, and did not answer her kindly

letter, should be remembered. Other radical and unaccounted changes are noticed. Nine beneficiaries are grouped together and given $3,000 each. Mr. Mead states that Mrs. Faling said she wanted to treat them alike so there would be no jealousy. When Mrs. Faling was in a normal condition of mind she was not worrying about a matter of jealousy on account of her bequests. Mr. Strong testified: "Mrs. Faling was not afraid of anything in the heavens above or the earth beneath. * * She was the most utterly courageous woman I ever saw." Note the care in the 1911 will and codicils thereto for an exact arrangement as she desired. As her interest in William E. Metzger increased or diminished she increased or decreased the provision for him in her will. When the 1915 will was signed no reference, comparison or consideration appears to have been made or given to the 1911 will and its codicils. It does not appear from the testimony that when the purported will of 1915 was signed Mrs. Faling was capable of understanding or knowing whether by the fifth clause of the instrument she disposed of a small balance or the bulk of her estate. Mrs. Faling had lived with her father and brother and would be likely to know her age within two years or such a matter; yet in the purported will her age is stated as 68 years while the record of births shows she was born on August 16, 1839, or was then 76 years of age. The statement therein, "being of sound and disposing mind and memory at this time," is peculiar.

After careful consideration of the record and the able briefs of counsel we find that the will of August 25, 1911, is the last will and testament of Xarifa J. Faling, deceased.

The decree of the Circuit Court is reversed, and one will be entered declaring the purported will of August 26, 1915, invalid, and directing the will of Xarifa J. Faling, deceased, executed August 25, 1911, to be admitted to probate. Under all the circumstances, the costs and disbursements of this proceeding in this court and in the lower courts should be paid by the estate of Xarifa J. Faling, deceased. It is so ordered.

REVERSED AND DECREE ENTERED. REHEARING DENIED.